STATE EX REL. ATTORNEY GENERAL VS. NORTHERN PACIFIC
RAILWAY COMPANY.

*February 28—May 1, 1914.*

EQUITY. *Remedies: Supersedure by delay: Discretion: Estoppel* in
pais: *Limitation of actions: Permitting acts to be done* nunc
pro tunc.
SUPREME COURT. *Original jurisdiction: Changing nature or form of
proceedings.*
CORPORATIONS. *Annulment of charter: Increase of capital stock:
Amendment of charter: Filing: Payment of fees: Enforcement
by state: Railroad corporations: Special charters and general
laws.*

1. Rights as regards remedies may, by·countervailing equities, under
   some circumstances, be superseded as to the state.
2. The right of the state to a judicial remedy to forfeit a corporate
   franchise may be superseded by delay in connection with other
   circumstances.
3. Whether delay and characterizing circumstances are such as,
   upon equitable grounds, to supersede the remedy of the state
   to punish a corporation by annulling its charter for nonuse or
   misuse thereof, rests in sound judicial discretion.
4. The purpose of the original jurisdiction of the supreme court,
   which is invoked, in an application for the annulment of a
   corporate franchise, is to protect the general interests of the
   state and its people and, consistent with such purpose, use of
   such jurisdiction is not permissible where the result would be
   detrimental to such interests or unduly oppressive, notwith-
   standing, independently thereof, a transgression has occurred
   warranting the relief sought.
5. The original jurisdiction of the supreme court is not available
   to destroy a corporation of *quasi*-public character, to the mani-
   fest prejudice of a large number of persons not tainted with
   the wrong complained of, in the absence of clear wilful viola-
   tion of law, affecting the very purpose of the corporate exist-
   ence and there being no other way of redressing the wrong.
6. If an application is made for use of the original jurisdiction of
   the supreme court in a particular way, or for a particular
   purpose, which does not seem proper, the matter will not, nec-
   essarily, be dismissed; the petition or complaint may be re-
   tained for such proceedings as may be thought appropriate to
   the case and directions be given accordingly.
7. Exercise of the power to increase capital stock under sec. 1826,
   Stats., requires an amendment to the corporate charter, within

the meaning of sec. 1820, Stats. *State ex rel. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 137 Wis. 80.

8. Sec. 1772, Stats., regarding fees on original stock of corporations or any increase thereof, applies to railroad corporations.

9. Aside from exceptions mentioned in sec. 1772, Stats., the legislative purpose was to include thereby all corporations as regards the obligation for payment of fees upon capital stock as to any corporation whether organized under ch. 86 or ch. 87 of the Statutes or an increase of capital stock of any such corporation or any existing under a special law.

10. The legislative response to the constitutional mandate for the enactment of laws to supply the place of prohibited activity as to granting corporate powers by special law was intended to be harmonious; bringing substantially into one system corporations organized under general laws and those organized under special laws.

11. Under the legislative plan for the creation of corporations under chs. 86 and 87, Stats., and the continued harmonious existence of corporations organized under special charters, all powers provided in the general laws for corporations created thereunder, including that to change fundamentals, were conferred on the corresponding class existing under special charters, and special rights inconsistent therewith, were superseded.

12. A change in the basic feature of a corporation is an amendment, in a proper sense, to its charter, whether so denominated in the written law or in the corporate proceedings to effect the change.

13. Every change in the fundamental features of a corporate charter of the class covered by ch. 87 and similar corporations existing under special laws, is an amendment within the meaning of sec. 1820, Stats.

14. Under sec. 1829, Stats., railroad corporations existing under special laws possess all the powers conferred upon similar corporations existing under general laws, subject to the same restrictions and duties as if their existence were referable to the latter, including the conditions of increasing capital stock.

15. An act of the legislature, specially incorporating into a special railroad charter which existed prior to the enactment of ch. 87, Stats., the provisions thereof as to increasing corporate stock, does not confer any new power on such corporation nor enlarge an old one.

16. An increase by a corporation of its capital stock by a method authorized by its charter, whether such charter be found in a special or general law or both, is a change in a basic feature of the organization by the execution of a corporate power, but none the less an amendment.

State ex rel. Att'y Gen. v. Northern Pac. R. Co. 157 Wis. 73.

17. Where the capital stock of a corporation shall have been fixed by its charter, whether resting in articles of organization under the general law or in a special charter, and the corporation possesses power to increase the amount of such stock, exercise of such power is conditioned by sec. 1772, Stats.

18. Mere delay by state officers to enforce performance of a duty imposed by law on a corporation does not preclude the state from enforcing such performance.

19. If the attitude of executive officers of the state be such as to efficiently influence a private corporation as to requirements to efficiently increase its capital stock, such circumstance will not create an estoppel *in pais* preventing the state from a change of attitude which does not impose any new burden on such corporation.

20. If a corporation fails to comply with the law as to making the record and paying the excise fee required upon increasing capital stock, because of excusable mistake in respect to the matter, but is ready and willing to strictly comply with such requirements as soon as known and conditions are created during the delay rendering annulment of the efforts to make such increase prejudicial to private and public rights,—the court may require the corporation to do, presently, what it neglected to do, seasonably, and without additional burden because of the delay and may give the late performance original validity by denying, upon equitable grounds, use of judicial remedies to any further extent.

21. There is no statute of limitations·barring the state from compelling a railroad company to comply with the duties incident to its existence, including the provision as to changes in capital stock.

22. The judicial power upon equitable conditions to permit an act to be done *nunc pro tunc*, technically applies only to acts omitted to be seasonably done in judicial proceedings; but a court of equity has power, in the interest of justice, to permit things to be efficiently done, outside of judicial proceedings, and the exercise of such power is in the nature of granting a privilege to do the thing *nunc pro tunc*, and may properly be spoken of as such.

23. What may or may not be permitted by the court in the field of equity jurisdiction, is limited by the justice of the case and, with all parties before it or represented, the court, within the limits of fair judicial discretion, is the judge of the means and manner and the measure of redress.

[Syllabus by MARSHALL, J.]

WINSLOW, C. J., and BARNES, J., dissent.

MANDAMUS action to compel the *Northern Pacific Railway Company* to file with the secretary of state duly authenticated papers showing an increase of its capital stock made July 1, 1896, from $5,000,000 to $155,000,000, and a second such increase, made the 7th day of January, 1907, from $155,000,000 to $250,000,000.

The state, in due form by its *Attorney General,* presented to the court a complaint in an action to secure a judicial forfeiture of the company's charter for breach of an alleged statutory duty to comply with the law as to doing that which this action is designed to compel it to do. Application to file such complaint and put defendant to its defense in respect to the matter was, in due form, brought on for hearing. The facts relied upon were these:

Defendant was incorporated, under the name of Superior & St. Croix Railroad Company, by ch. 326, P. & L. Laws of 1870. Sec. 15 of such chapter limited the capital stock to $5,000,000 with the privilege of increasing the same to any sum not exceeding $10,000,000. The charter was so changed by ch. 244, Laws of 1895, as to give the corporation power to increase its capital stock to any extent deemed advisable, as expressed by the holders of a majority of all stock outstanding, for the purpose of carrying on its business. Its existing powers under the charter of 1870 were confirmed. Additional powers were granted and it was declared that the corporation should have all "the rights, powers, privileges and immunities conferred upon railroad corporations by chapter 87 of the Revised Statutes of 1878 and the acts amendatory thereof and supplementary thereto," and it was made subject, except where inconsistent with the special charter, to the restrictions imposed upon railroad corporations by said ch. 87 and all amendatory and supplementary acts. Sec. 1829, R. S. 1878,—part of said ch. 87, and thus incorporated into defendant's charter,—made all existing and future railroad companies subject to the duties, liabilities, and restric-

1] JANUARY TERM, 1914. 77

State ex rel. Att'y Gen. v. Northern Pac. R. Co. 157 Wis. 73.

tions prescribed by said chapter. Sec. 1820, R. S. 1878,— part of said ch. 87, and, as aforesaid, made a part of defendant's charter,—required all amendments to articles of incorporation of railroad corporations to be filed in the office of the secretary of state.

Prior to the increase of stock, the aforesaid sections of the statutes being then in force, the name of defendant was changed by resolution of its stockholders and directors, in compliance with said sec. 1820 as to filing in the office of the secretary of state.

July 1, 1896, the corporation, under its new name, by due proceedings of its stockholders, determined and pretended to increase its capital stock to $155,000,000, thereupon issued certificates of stock for the increase, and has ever since treated such certificates as representing valid stock, though no evidence of such increase has been filed with the secretary of state.

January 2, 1907, the stockholders of the corporation, in like manner as before, pretended to increase its capital stock to $250,000,000 and issued certificates, accordingly, which it has ever since recognized as valid, though no evidence of such increase has been filed with the secretary of state. The resolutions adopted by the stockholders in each instance of increasing capital stock were amendments to the corporate articles.

By so pretending to increase its capital stock without complying with the laws of its creation and existence respecting filing as amendments to its corporate charter a duly authenticated copy of the resolution adopted to effect such increase, it usurped and continues to usurp franchises and exercise corporate power which it does not possess, and has offended, and continues to offend, against the laws of its being and existence.

The prayer for relief was that the corporation be required to answer by what authority it issued certificates of stock in

excess of $10,000,000 and why judgment should not be rendered annulling its existence for its violation of law.

Attached to and made a part of the complaint, were copies of the resolutions aforesaid. By the first resolution authority to act in the matter was expressly made referable to the special power contained in the act of 1895, which was granted in the language, substantially, of sec. 1826, R. S. 1878, with some changes to make the same adaptable to the particular case, and was also made referable to said sec. 1826 and sec. 1829, R. S. 1878,—all of such provisions of law being incorporated *in extenso* into the resolution.

By the second resolution authority to act was also made referable to the general statutes as well as the express provisions of the charter though in general language.

The three provisions of law thus forming the legal basis for the two increases of stock and thus incorporated into the first resolution are as follows:

Ch. 244, Laws of 1895. "Section 10. Section 11 of said chapter 326 is hereby amended so as to read as follows: Section 11. The capital stock of said company may be increased from time to time to such an amount as may by its stockholders be deemed necessary for the construction, acquisition or operation of any of its railroad or railroads, by a vote of the owners of record of at least a majority of all its outstanding stock, in person or by proxy, at any annual meeting, or at any meeting called for that purpose, by a notice in writing to each stockholder," etc.

Revised Statutes 1878. "Section 1826. The capital stock of any such corporation may be increased to such amount as may by its stockholders be deemed necessary for the construction or operation of its road, by a vote of the owners of at least two thirds of all its stock, in person or by proxy, at any annual meeting; or at any meeting called by its directors for that purpose, by a notice in writing to each stockholder, to be served on him personally, or by depositing the same in the postoffice, postage paid, properly directed to him at the postoffice nearest his usual place of residence, at least twenty days prior to such meeting. Such notice shall state the time

and place of such meeting, its object, and the amount to which it is proposed to increase such capital stock. No vote in favor of such increase shall take effect until the proceedings of such meeting, showing the names of all the stockholders voting therefor, and the amount of stock owned by each, shall be entered upon the records of such corporation."

Revised Statutes 1878. "Section 1829. All existing or future railroad corporations within this state, including such as were originally organized under chapter seventy-three of the revised statutes of eighteen hundred and fifty-eight, shall respectively have and possess all the powers and privileges, and be subject to all the duties, liabilities and restrictions prescribed by this chapter, and shall also have all peculiar rights and privileges granted to them respectively by their charters or any special law, not inconsistent with these statutes."

In opposition to the application defendant filed affidavits showing these facts:

In 1893, under a plan agreed upon by the owners of a large majority of the stockholders of the Northern Pacific Railroad Company, then insolvent, it became necessary to provide capital stock to the amount of $155,000,000 divided into $75,000,000 of preferred and $80,000,000 in common stock. That was accomplished by a sale of the property of the insolvent to defendant, an increase of its capital stock to $155,000,000 in 1896 and the issue of such stock in the acquirement of the property purchased. Such stock, and the additional stock issued pursuant to the second increase, were properly listed on the New York Stock Exchange and on other markets and have been dealt with ever since without any question being raised as to its validity until the application for leave to commence an action to annul the defendant's charter for failure to comply with the law in respect to the changes in the capital stock. Between the time of the first and the second increase of stock the number of stockholders increased from sixteen to upwards of 2,600. The stock has always been recognized as valid in the distribution of earn-

ings to stockholders.   Each year, since September 1, 1896,
defendant has filed a report with the railroad commission of
the state of Wisconsin.   Such reports brought, promptly and
fully, to the attention of such department the status of the
defendant as regards capital stock, the issuance thereof, the
purpose of the issue and the disposal of the proceeds in
the original purchase and improvement of and additions to
the property.

Attached to the affidavit and made a part thereof, was a
copy of the plan for acquirement by the defendant of the
property of the insolvent Northern Pacific Railroad Com-
pany and conversion of the bonds and stock of the old com-
pany and its subsidiaries into stock and securities of the de-
fendant.

A further affidavit was presented showing that, yearly,
since January 3, 1903, a report was filed by the defendant as
to outstanding capital stock, both as to preferred and common,
and, in particular, the fact that $155,000,000 in capital stock
was issued during the period from 1896 to 1908, that the
stock was listed on the New York Stock Exchange; that, com-
mencing prior to 1902, the preferred stock had been called in
and replaced by common stock, and that nearly the whole
amount of $250,000,000 of the authorized capital stock or
subscription receipts eligible to surrender for stock, there
being but little of the latter, was outstanding.   The report so
filed with the Wisconsin tax commission included a state-
ment of the total mileage of the defendant and each state in
which a part of its system was located and other informa-
tion, all of which was required by said tax commission in fix-
ing the value of defendant's property in Wisconsin for the
purpose of taxation.   Its property was valued by aid of such
reports and information and taxes were levied thereon and
paid.

For reasons, briefly stated in the opinion, the application
to annul the corporate existence of the defendant was denied;
but, on the court's own motion, the complaint was retained

and ordered filed as a petition for an alternative writ of *mandamus* in an action to put the defendant to its defense as to whether it should not do that which it was claimed it ought to have done.

An alternative writ of *mandamus* was accordingly issued, to which due return was made setting forth, substantially, the facts before stated as regards the history of the two increases of stock, the good faith of all transactions in respect thereto, the publicity of all proceedings and facts, particularly, as regards information furnished the administrative departments of the state and, further, this: The amount of defendant's capital stock since it acquired the property of the Northern Pacific Railroad Company has been a matter of public notoriety by means of reports made, year by year, to the state of Wisconsin and other states, the publication of such reports and otherwise. By ch. 193, Laws of 1899, the legislature expressly legalized the stock in question. Defendant did not do the things now insisted that it ought to have done because it was advised by its counsel, who were well learned in the law of the state of Wisconsin, that such laws did not require or authorize such things to be done, which it verily believed to be true and in good faith relied on. It never had any articles of organization or amended any such articles. Its increase of capital stock was accomplished in the exercise of a special power to do so in the way it was done, and not by way of amendments to its charter or any articles of organization. Since inheritance taxes were required under the laws of the state of Wisconsin all the capital stock of the defendant has been recognized by the state as legitimate and such taxes have been exacted and paid, accordingly, both as to resident and nonresident stockholders. During the seventeen years since the first increase of capital stock and more than six years since the second increase, no suggestion was made of any failure of duty in respect thereto on the part of defendant until shortly before the commencement of these proceedings. It would be inequitable, under the circumstances, to require

defendant to do now what the state of Wisconsin through its law department claims it ought to have done as to the first increase of stock and at the same time be burdened with the condition as to payment to the state of one dollar per thousand dollars of the increase of stock, since when such increase was made no such condition was required to be complied with.    Defendant claimed the benefit of secs. 4222 and 4229, Stats. 1911, and secs. 4229 and 4222, sub. 4, R. S. 1878, as having extinguished plaintiff's right now claimed, if it ever possessed such right.

There was a demurrer to the return and the issue therein joined was duly submitted.

The *Attorney General* and *Winfield W. Gilman,* assistant attorney general, for the plaintiff.

*Charles W. Bunn,* with *George D. Van Dyke* of counsel, for the defendant.

MARSHALL, J.

I.

The application for leave to commence an action in this court to annul defendant's corporate franchise, presented this proposition: Assuming that the remedy sought is appropriate under any circumstances which might be disclosed consistent with admitted facts, and that the statute as to changing the fundamentals of a railroad corporation, denominated an amendment in sec. 1820, R. S. 1878, applied to defendant when the occurrence happened which was intended to work an increase in the amount of its capital stock,—first to $155,000,000 and second to $250,000,000, and it, nevertheless, did not comply therewith by filing papers in the office of the secretary of state, evidencing the changes; but there was no intention of thereby defying the law, the defendant acting under advice of counsel and in good faith believing it possessed authority to make such changes in execution of a special charter power on the subject and the state, by silence, with full, or reasonable means of knowledge of the facts, ac-

quiesced for nearly twenty years as to the first change and six years as to the second,—its departments taxing and dealing with defendant, regulating it and profiting by its expansion of capital,—thus by conduct impliedly assuring it and the public that the two efforts were legitimate and the new certificates represented valid corporate stock, and investors, relying thereon, have freely and publicly dealt therein, and no disadvantage to the state or its citizens will have accrued if defendant does, presently, what it should have done before issuing such certificates, while an annulment of its franchise would cause loss to many innocent individuals and be detrimental to public interests,—should this court permit its jurisdiction to be used as requested, in advance of a judicial determination of the disputed question, and, if in favor of the state, neglect by defendant to seasonably atone for its nonfeasance in such manner as judicially advised or directed, in case of its being held that responsibility in the matter has not been extinguished by laches or some statutes of limitation?

The foregoing states, briefly, the whole case as first presented. It does not follow as matter of course, that, because there is ground for forfeiture of a corporate franchise, this court should permit its jurisdiction to be used to that end. Rights as regards remedies may, by interfering equities, under some circumstances, be lost by the state as well as by individuals. It has no vested or inherent right in such matters which it may use unjustly and oppressively, being dependable, as it is, for vitality of such rights, upon the original jurisdiction of this court, which is said to be "unlimited in extent," "undefined in character,"—*Att'y Gen. v. Railroad Cos.* 35 Wis. 425; *State ex rel. Fourth Nat. Bank v. Johnson,* 103 Wis. 591, 79 N. W. 1081,—clothed with sovereign authority of the people,—so, necessarily, as limitless as the exigencies of situations requiring judicial interference. Such was the wise purpose of the framers of the constitution,—*State ex rel. Umbreit v. Helms,* 136 Wis. 432, 118 N. W. 158,—to create a power equal to all emergencies, to be

used as sparingly as should comport with its dignity and the importance of the matter to be dealt with, and always to the end that justice might be done,—justice in the broadest sense, judicially cognizable, which may, and often does, rise above and render dormant remedies for vindication of strict legal rights.

The stated proposition seems to be decidedly ruled in defendant's favor by these principles. Time may be so characterized by circumstances as to estop the state from enforcing legal rights and require the court, in the exercise of sound judicial discretion, to refuse to open its door to an effort to that end.

An application for leave to use the original jurisdiction of this court to annul a corporate franchise, is addressed to sound judicial discretion and should not be permitted as to a going corporation, carrying out the design of its creation, performing duties of a *quasi*-public character, having to do with the daily necessities of a large number of people and involving large investments in which many innocent persons are pecuniarily interested in its undisturbed continuance, unless there is a clear, wilful misuse, abuse, or nonuse, of the franchise sought to be forfeited, or an intentional or inexcusable violation of law, striking at the very groundwork of the contract between the sovereign power and the corporation, whereby the latter fails to fulfil the very design and purpose of its organization, and there is no other way of adequately meeting the case.

Those principles are familiar and control any situation to which they apply. Whether the facts call for such application or not in any given situation, depends upon matters of fact to be evidentiarily established and judicially found, if not admitted. Activity of the power is fenced closely about by equitable principles, the objective, in each case, being justice, reasonable doubts, *inter partes,* to be resolved in favor of public interests. This court has many times applied these

salutary principles; the significant instances being those re-
lied upon by counsel for defendant.   *State ex rel. Att'y Gen.
v. Janesville W. Co.* 92 Wis. 496, 66 N. W. 512; *Att'y Gen.
v. Railroad Cos.* 35 Wis. 425; *Ashland v. Ashland W. Co.*
110 Wis. 94, 85 N. W. 695; *Linden L. Co. v. Milwaukee E.
R. & L. Co.* 136 Wis. 179, 116 N. W. 900.   In the last in-
stance cited it was given as the settled rule that "only when
the action of the corporation is wilful should the attorney
general be permitted to bring suit to annul its charter."

Thus it will be seen that the duty here, at the start, was
plain.   There was no wilful defiance of law,—only, at most,
a good faith, nonnegligent mistake of law, in which the state
as well as the corporation participated, without, necessarily,
any real injury to the public.   What the real right of the
matter was, when the petition was presented, as at every
point of time since the alleged nonfeasance occurred, was in-
volved in such doubt that only this court could solve it and,
though solved in favor of the state, such solution would not
furnish any legitimate basis for discretionary activity of this
court looking to an annulment of defendant's existence, in
the absence of defiance of the thus established law and per-
haps no way being open to adequately punish the corporation
and vindicate the dignity of the law without serious detri-
ment to the public and innocent proprietors of stock.

In the situation indicated, this court might have dismissed
plaintiff's application and left the attorney general to pro-
ceed, at his convenience and as he might see fit, to seek re-
dress in some other way; but, in harmony with the practice
and policy to promote the most direct and speedy termina-
tion of controversies, practicable, especially where great pub-
lic interests are involved, it used its authority, as regards the
time and manner of affording use of its jurisdiction, by de-
nying use thereof for the purpose requested; but retaining
the petition as initiatory to appropriate proceedings to se-
cure a judicial determination as to whether defendant had

86  SUPREME COURT OF WISCONSIN.  [MAY

State ex rel. Att'y Gen. v. Northern Pac. R. Co. 157 Wis. 73.

offended, as claimed, and, if so, whether it should repair the wrong by yet doing what it ought to have done, so far as practicable.

Thus,—fully reserving all questions on the merits as they might in the future appear, in case of defendant's conduct subsequent to determination of its duty being such as to render a second application for termination of its existence appropriate, a writ was issued, appropriate to such determination and to coercion, if need be or advisable, as to performance of such duty. This manner of retaining a subject matter once brought within the court's jurisdiction and speeding its judicial settlement, regardless of whether the manner of approach to the court be strictly appropriate or not, has become a matter of settled policy, to the end that justice be not delayed by want of co-operation here in securing a speedy termination of controversies, or hesitation in directing the proper proceeding to that end, shaping the direction to fit the exigencies of the particular situation, and without any necessary restraint by precedent.

## II.

Whether the facts alleged on behalf of the state and conceded by defendant show that the latter violated the law as claimed is very much narrowed by *State ex rel. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 137 Wis. 80, 117 N. W. 846. Counsel for defendant, in harmony with its claim of good faith, appreciate the logic of that case and confess its authority; but maintain that there is a vital distinction between the situation there dealt with and the one before us.

These points of harmony between the former and present situation clearly exist: Sec. 1772, R. S. 1878, as to amendments to corporate charters did not, originally, apply to railroad corporations, nor was there any clear specific provision on the subject in the chapter relating to such corporations, nor any provision as to payment of a certain amount per

thousand dollars in case of an increase of capital stock. That condition existed up to 1898, including the time when the first increase of stock was made. Sec. 1772, though in the chapter specially devoted to ordinary corporations, was then so changed as to make it apply to corporations in general as to payment of fees for increasing capital stock. The duty to pay was made incident to the increase, not to filing proof thereof. The language was, "and every corporation organized . . . under the laws of this state which may hereafter increase its capital stock shall pay as a fee therefor fifty cents for each one thousand dollars of increase," etc. Sec. 1772, Stats. 1898. In harmony therewith, sec. 1820, R. S. 1878,—as to formation of railroad corporations, which did not, originally, contain any provision for filing amendments to corporate articles with the secretary of state, but did as to original articles,—was changed by adding thereto this: "For filing such articles the secretary of state shall collect the fee prescribed in section 1772 for filing articles under chapter 86, and if amendments to such first mentioned articles are filed he shall collect the fee fixed by said section for filing amendments thereunder." Sec. 1820, Stats. 1898. The power of amendment was originally given by sec. 1826, R. S. 1878. It did not provide for filing proof of a change with the secretary of state. If such filing was required, it was by inference from the requirement as to original articles.

Thus it will be seen that by the change there was no express mandate to file proof of a change increasing capital stock, but such filing was referred to as something to be done as matter of course. Payment of the fee was not made incidental to the duty to file. In harmony with sec. 1772 it was made a duty incident to the act of increasing the stock.

The statutes were not, materially, changed thereafter until ch. 507, Laws of 1905. Thereby sec. 1772, as before, referred to railroads as well as other corporations, but payment of the charge per thousand dollars was increased to one dol-

lar, and made incident to filing the amendments. That is to say, payment of the fee no longer waited upon filing the amendment, but capacity to file was made to depend upon such payment. In this condition, notwithstanding sec. 1826, as to increasing capital stock of railroad corporations, did not refer to proceedings to that end as involving an amendment to a corporate charter and, standing by itself, inferentially, provided that the vote to increase the stock should take effect upon a record thereof being made upon the books of the corporation, by retention of sec. 1772 conditioning the filing of amendments the same as to all corporations, and sec. 1820, treating the act of filing as a condition of exercising the power of amendment, and making sec. 1772, as to the particular matter, apply to railroad corporations,—exercise of the power granted by sec. 1826, was held in the former case, to, in fact, involve what was denominated an amendment in sec. 1820. The foregoing which seems plain and is conceded to have been rightly decided in *State ex rel. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 137 Wis. 80, 117 N. W. 846, is said by counsel for defendant not to apply now because it relates to changes in articles of incorporation which are required to be filed with the secretary of state and not to special corporate charters,—that the distinction between defendant and the corporation before is that the former is referable to its special charter, while the latter was referable to the general law under which there were articles of incorporation and amendments thereof with which the court had to deal.

As indicated, that the statute in 1898, dealt with all corporations as to conditions of increasing capital stock, there is no question. There is no mistaking the words "every corporation organized and doing business under the laws of this state which may hereafter increase its capital stock," etc. While perhaps the precise point now of whether that refers to railroads existing under special laws was not here before,

it seems plain from what was then said as to the legislative idea of conditioning, as indicated, regardless of anything except the circumstance of organization and doing business "under the laws of this state," that it applies as well now as then. All were referred to. The legislature did not intend to make any favored class as regards the public record of changes in fundamentals and payment of fees. What was then said as to absurdity of burdening corporations organized under ch. 86 of the Statutes with the conditions mentioned in sec. 1772 and not those organized under ch. 87, applies quite as forcibly to burdening corporations organized under general laws with such condition and not those organized under' special laws. The whole scheme was to put all, as to manner of changing fundamentals, particularly the pecuniary incident and the public record with the secretary of state, in a single class. On this branch of the case we can see no room for differentiating between the former situation and this one.

What has been said is emphasized by the fact that, in the general scheme for dispensing with the power to grant special corporate charters and providing for the organization of corporations under general laws, existing corporations, so far as practicable, were brought into harmony therewith by sec. 1829, in that it provided that they should "have and possess all the powers and privileges and be subject to all the duties, liabilities and restrictions prescribed by this chapter, and shall also have all peculiar rights and privileges granted to them respectively by their charters or any special law not inconsistent with these statutes." Thus all parts of ch. 87, including that in relation to changing the amount of capital stock under sec. 1826, and that in relation to filing amendments and the payment of fees under sec. 1820 and sec. 1772, were written into every special railroad charter. The full scope of the legislative purpose to thus put railroad corporations into one class so no subsequent special legislation would be needed to enable them to carry out the design of their cre-

ation, cannot be appreciated without taking note of the fact that the effort was not to make the general scheme subservient to special charters, but was to make the latter bend to the former. After conferring all powers and privileges of the general scheme on corporations existing under special laws, subject to all the duties, liabilities, and restrictions of such scheme, the special rights and privileges were preserved only so far as not inconsistent with such scheme.

Counsel for plaintiff urge that such changes as those in question were not expressly provided for by the general law, and that it should be restrained to its particular subject. The purpose, the letter, and the spirit of the general law seem inconsistent with that view, as what follows with the foregoing seems to show.

The constitutional amendments adopted in 1871, prohibiting the granting of corporate powers and privileges, except to cities, sec. 31, art. IV, and commanding the legislature to "provide general laws for the transaction of any business that may be prohibited by section thirty-one of this article, and all such laws shall be uniform in their operation throughout the state," sec. 32, art. IV, led to the enactment of the general laws under consideration. It is evident that the legislative purpose was to create a comprehensive scheme covering the whole field,—to respond so fully to the constitutional mandate as to render special legislation, later, entirely unnecessary. That the essentials of a complete system were thought to include one for amending special charters without calling upon the legislature for special assistance, is quite manifest. That is particularly indicated by sec. 1790, in that it affords corporations of the kind mentioned in ch. 86 of the Statutes, but organized under special laws, power to amend their charters. That being so, it would be strange indeed if there were no such power in the companion scheme as to railroad corporations. The harmony and completeness of the scheme, evidently intended, suggests that. **From an original**

standpoint, it seems most probable that the legislature consid-
ered that the constitutional command required it. There-
fore is not the idea that such feature was omitted so very un-
reasonable as to be sufficient to move one to discover it by
construction, if it be not discoverable in letter?

If we keep in view that a change in fundamentals is an
amendment, regardless of whether it is called such or not, we
will have little or no difficulty in perceiving that corporate
power to amend special railroad charters was conferred quite
as fully in the general law as to railroad corporations as such
power was respecting ordinary corporations. 1st. Sec. 1820
refers to changes in fundamentals of railroad corporations
as amendments; 2d. Sec. 1829 confers all powers granted by
the general laws upon every existing railroad corporation, to
be exercised subject to "all the duties, liabilities and restric-
tions prescribed" by ch. 87 of the Statutes, including the con-
ditions of making amendments prescribed by sec. 1772 in con-
nection with sec. 1820; 3d. Sec. 1831 confers power to build
branch lines and make extensions, sec. 1832 power to make
other changes in plan of road, and sec. 1835 to changing cor-
porate name. Each applies to any corporation organized
under the laws of this state; but before being exercised cor-
porate action is necessary as in case of a change in fundamen-
tals; 4th. A change under sec. 1826 by reference to sec. 1772
and sec. 1820, is required to be evidenced, as we have seen,
upon the records of the secretary of state and a change under
either secs. 1831, 1832, or 1835 is expressly required to be
likewise evidenced.

Evidently we must survey the subject discussed from the
viewpoint of the legislature when it responded to the com-
mand to provide by general laws for doing the business for-
merly done by special enactments. It was the granting of
corporate power by special act, which was prohibited. The
language is general. The legislature might well have sup-
posed, probably did suppose, that to enlarge a corporate power

of an existing corporation, or grant it a new power or privilege, essentially corporate, was within the meaning of "granting corporate powers or privileges." There is nothing in the laws passed to satisfy the requirement for a new system to indicate that special corporate powers were reserved by the constitution or by the general laws for unlimited special legislative interference.

We are not unmindful of what was said in *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, 528, as to the effect of the constitutional amendment of 1871 upon existing special charters. The precise point under consideration then was whether such amendment so limited sec. 1, art. XI, of the constitution as to power to alter or amend or repeal corporate charters that, as to existing charters, they could only be thus dealt with by general laws. The court felt bound to save such power, thought to have been designed to prevent corporate charters from being beyond legislative interference under the rule in the *Dartmouth College Case* (*Dartmouth College v. Woodward,* 4 Wheat. 518), if that were possible. So, by construction and logic which has not since been questioned, it was held that the reserved power was not affected by the prohibitory section. That was repeated in *Black River Imp. Co. v. Holway,* 87 Wis. 584, 59 N. W. 126. Whether such decisions mean that legislative power to act, specially, remains as to special corporate charters existing at the time of the amendment of 1871, unaffected thereby—revising the same, enlarging old powers, granting new powers, and even changing the original design so as, in practical effect, to make a new corporation,—the court has not yet ventured to say. The question was raised in *Att'y Gen. v. S. & St. C. R. Co.* 93 Wis. 604, 67 N. W. 1138, as to the charter now before us, but was not decided. We do not need to decide it now, though if it were necessary to the case, the radical change in defendant's charter would furnish opportunity to meet the question squarely. In any event, as we have before indi-

cated, the letter and spirit of the general laws show a legislative purpose to cover, in a comprehensive way, the entire subject of creating and changing corporate charters, to engraft upon existing special charters all power obtainable by a new corporation, and to bring the old charters into harmony therewith by leaving surviving only such features thereof as were not inconsistent with the new scheme.

Now, how is the situation above indicated changed by the passing of ch. 244, Laws of 1895? It did not give the corporation any power which it did not possess before. Sec. 11 of the charter of 1870 was superseded by a section on an entirely different subject,—that of increasing capital stock,—which is, in the main and in the whole, as regards this case, a mere rewriting into the special charter of sec. 1826 which was there before by force of sec. 1829.

It is argued that what seems to be a mere change in form of the corporate power to change the character of the corporation as to the amount of capital stock, is a new power. We apprehend such claim would not be made except for the false premise, as it appears to us, that the provisions in the general statute as to changes in capital stock do not characterize the special charter. That the purpose was to write, unmistakably, the general statute provisions into the special charter, to all intents and purposes creating evidence of an existing condition, is evidenced by the fact that the old provision on the subject of capital stock was not retained and made to harmonize with the rewritten general law. It was dropped out and, at the end, expressly repealed, leaving nothing in the charter, for the time being, as to authorized capital stock, except, possibly, recognition of existing stock by the introductory words of the change: "The capital stock of said company may be increased." The purpose to retain the advantage of sec. 1820, sec. 1826, and sec. 1829 of the general laws, and "all the rights, powers, privileges and immunities conferred upon railroad corporations by" "chapter 87 of the Revised Stat-

utes of 1878 and the acts amendatory thereof and supplementary thereto," . . . "save where inconsistent herewith, subject to the restrictions, duties and liabilities imposed upon railroad corporations by said chapter and all amendatory and supplementary acts," is expressly declared.    In that is a practical rewriting of the whole general statutory scheme for railroad corporations into the special charter.    The clause "save where inconsistent herewith," does not point to the statutory scheme for amending railroad corporate charters because they consist with each other.    The general repealing clause, phrased in the common form: "All acts and parts of acts inconsistent with or in any manner contravening the provisions of this act are hereby repealed" does not change the situation; 1st. Because it is evident that the legislative intent was to reach only the original charter and the acts amendatory thereof and not anything in the general statute; 2d. Because the general statutes on the subject of increasing the capital stock of railroad corporations are not inconsistent with the revised special charter; 3d. Those parts of the general law which were applicable to the special charters were expressly declared to be left undisturbed.

If what has been said were otherwise, it would be quite a grave question whether it is competent for the legislature to repeal the general law as to a particular corporation, putting that in a class by itself, so that, whereas all other railroad corporations would be powerless to change the amount of their corporate stock without complying with the general law as to filing proof of corporate action in the matter with the secretary of state and payment of an excise fee of one dollar per thousand dollars of the increase, the particular corporation may do so.    It is not likely that the legislature thought of so discriminating.    It would require manifest intent to warrant the court in holding that it did.

The manner in which defendant exercised its supposed power after the amendatory act of 1895 confirms what has been said.    Such manner constitutes a striking practical con-

struction of the revised charter in connection with the general law.    Defendant did not venture, under the direction of eminent counsel, to change its capital stock, solely, with reference to its new special constitution.    It grounded its action thereon in connection with secs. 1826 and 1829 of the Statutes, and, by necessary inference, upon sec. 1820 as well, providing, as we have seen, that changes in fundamentals of a railroad corporation as to amount of corporate stock shall be subject to sec. 1772 of the Statutes as to filing with the secretary of state and payment of the fee of one dollar per thousand dollars of the increase.    How then can it be efficiently claimed that its act was in mere execution of a special corporate power and not an amendment?    That such a change is an amendment, though not called such in sec. 1826 of the Statutes, is ruled, as we have seen, by *State ex rel. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 137 Wis. 80, 117 N. W. 846.    What was there said on the subject applies just as clearly to the present situation.    There seemed before, as there seems now, to be no way of escaping the conclusion that a change in the capital stock, in principle, is an amendment to the fundamentals of a corporation.    The fact that it is so dealt with in sec. 1820 was thought there, as it is now, to be conclusive.    The increase in the former case was in execution of a corporate power, referable to the general law, in the same sense as the one in question is the execution of such a power whether referable to the special charter, or the general law, or both.    Where is the difference from any logical viewpoint?    We cannot perceive any.

The reason of the statute as to filing proof with the secretary of state and payment of the excise fee does not rest in any mere name but the fact that it is a change in the fundamental features of the corporation.    Can there be any doubt but what a fundamental change, whether made by the legislature directly or by the corporation itself by legislative authorization, is an amendment, whether called by that name or not?    It matters not whether the constitution of the corpora-

tion rests in special charter alone or in that in connection with the general law, and is called a charter, or in the general law in connection with a declaration containing in whole or in part recitations from such law, and denominated articles of incorporation.   In either case the grant of corporate powers and privileges by sovereign authority is the substance of things.   Regardless of what name is given to the grant, it is the constitution or charter of the corporation.   Its capital stock being once fixed in amount, either by direct legislative action or by authorized corporate action, that is a fundamental feature of its organic act.   If by another such feature it possesses a delegated authority to change the former, such a change, logically, must be regarded as answering to what is denominated an amendment in sec. 1820 of the Statutes, and conditioned for efficiency, as we have seen, upon compliance with such section, in connection with sec. 1772.   Any other result, it seems, would be entirely out of harmony with the reasoning upon which the former decision was grounded.

The result of the foregoing is that it was the duty of defendant on each occasion of its increasing its capital stock, to file proof thereof with the secretary of state and comply with all conditions to validity.

So the pretended changes were not effectual.   Let it be conceded, for the case, that it was competent for the state to waive performance of such duty or become estopped by conduct from insisting upon it; that there was no waiver seems plain, since there was no express or implied intention to waive.   It would, in any event, take a very strong case to warrant holding that the mere negligences or mistakes of public officers constitute a waiver of performance of an important duty created for protection of the public interests.   There was no known right here, there was a mutual supposition that the duty in question did not exist.   If there is any fault in the matter it rests more at the door of the defendant than that of the state.

Is there any good ground for the claim that the state has

lost its right to have the duty in question performed by laches? Estoppel rests in principle, whether, in the ultimate, the bar be called legal or equitable. That is elementary. If there be any branch of the law of estoppel which could in any event apply to this case, it is that of estoppel *in pais.* That is essentially equitable. The principle is this: He who acts, or fails to act when he ought to act, under such circumstances as to charge him with knowledge, that another to· whom he owes a duty not to deceive, may probably rely thereon to his damage in case of appearances not being according to the facts, and such other does in good faith so rely, cannot thereafter change his position to such other's detriment. If one is silent when he ought to speak the law will close his mouth or turn a deaf ear to him when he attempts to speak. This principle is a powerful instrumentality of justice, displacing all others when it applies. It is said that, "It stays the operation of other rules which have not run their course, where to allow them to proceed would be a greater wrong than by permanently enjoining them." *Marling v. FitzGerald,* 138 Wis. 93, 120 N. W. 388; *Kimball v. Baker L. & T. Co.* 152 Wis. 441, 451, 140 N. W. 47; *Knauf & T. Co. v. Elkhart Lake S. & G. Co.* 153 Wis. 306, 141 N. W. 701.

Such an estoppel as the one under discussion goes no further than the reason for it,—to protect the party in whose favor it arises. Being based on equitable principles, countervailing equities, so far as they go, are to be considered.

In this case no damage could, in the natural course of things, accrue to defendant by reason of any fault of the state; conceding, for the point that there were such fault, other than such as would result from the increase of stock being held irremediably invalid. If the right to proceed to that extreme be waived, conditionally or coercively be put aside, there is no room left for any real damage to defendant unless it should be required to now comply with the statute as it presently exists, whereas had the duty been seasonably

performed it would have happened when not burdened with the condition as to payment of the excise fee as to the first increase of stock. As to the second increase, amounting to $95,000, the burden would be no greater now than when the duty should have been performed, if only the face of the excise fee be required. In a balancing of equities, the defendant would then have a very substantial advantage, in that it would be enriched to the amount of the use of the $95,000 for a period of some seven years and the state would be correspondingly impoverished.

As to the first increase, to burden defendant with the condition of performing the neglected duty as the statute now is, would penalize defendant for the enrichment of the state in the sum of $150,000 on account of what seems clear to have been an innocent mistake in which distinguished legal advisers participated,—a mistake not involving anything more than mere error of judgment, after a careful professional study of the subject. There is no principle which requires or justifies that. The court charged with the duty of administering justice according to the equities of the case would not hesitate to deny relief which would mean such consequences, especially if the technical wrongdoer does not evince a disposition to defy the law when authoritatively declared, as seems to be the attitude of defendant.

It follows from what has been said, that the defendant should perform now, as it originally ought to have performed and without any greater burden than would have been incidental to performance then. The question has not been passed without thought of whether the value of the use of the excise fee of $95,000 which defendant has gained and the state has lost should be added to the amount the state should receive, and the duty of complying with the law not only be declared but performance only conditioned upon payment of such value in addition to the principal sum.

The value of the use of the deferred payment cannot well be exacted as interest upon a debt, nor can it be regarded as

damages properly allowable on equitable principles for a
wrong.    There was no wrong in intention, actual or con-
structive.    It is considered that the matter should be put upon
the basis of an unliquidated claim, involved in such doubt
and difficulty that defendant is excusable for not acting in the
matter in advance of its legal status being judicially deter-
mined,—certainly not in advance of a demand.    No demand
was made until shortly before the commencement of these pro-
ceedings,—perhaps none except by filing the complaint charg-
ing a violation of law in respect to the matter.    In such cir-
cumstances it is thought that defendant should not be penal-
ized by being required to pay the value of the use of the de-
layed payment.

We have reached this point without needing to refer to
authority outside our statutes and the decision in *State ex rel.
Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 137
Wis. 80, 117 N. W. 846.    Construction of the statutes, the
principles of the former decision, and familiar elementary
principles, have seemed to be sufficient for guidance.    Hence
we have not burdened this opinion by referring to and dis-
cussing the many authorities with which the industry of
eminent counsel has favored us.

We yet have the question of whether the state is barred by
some statute of limitations from efficiently insisting upon per-
formance of the neglected duty, so far at least as concerns the
excise fee.    This is not discussed in the briefs of counsel for
defendant as to the second increase of stock.    As to that
laches only seems to be relied on as a bar, which, in our judg-
ment, does not apply for reasons already sufficiently stated.
We find nothing in the authorities cited out of harmony there-
with.

Reference is made to sec. 4229 and sec. 4222, Stats. 1911,
and sec. 4229 and sec. 4222, sub. 4, R. S. 1878, as precluding
the state from insisting upon performance of the neglected
duty as to the first increase.    We are unable to find anything
in either provision which deals with such a situation as we

have here. It is unnecessary to refer in detail to the matters covered by such statutes. The right sought to be vindicated here is merely to have the defendant comply with a condition of its organic act, found in the general statutes forming a part of its charter, and in the latter as well. That is the primary right. It may be, and probably is, the fact that replenishment of the public treasury to some extent is the mainspring of present activity by the *Attorney General.*

However, the primary right and the remedy to vindicate it are not affected by the incidental benefit to the state of a pecuniary nature. Whether the incident be the main thing the *Attorney General* had in view, and the primary right a mere instrumentality to secure it, or the real right is the main thing and the incident is secondary, in fact as well as in purpose, makes no difference. The action of the *Attorney General* is conformable to his duty and commendable.

The idea is advanced that the first increase of stock, if invalid in the beginning, was validated by ch. 193, Laws of 1899. That was an amendment to sec. 1753 of the Statutes prohibiting the issuance of authorized stock for less than a money value consideration corresponding to the face of the stock. Its purpose was to cure defects in stock which had been put afloat in violation of such prohibition. It was not intended to cover an invalid increase of stock or an illegal change of any kind in corporate status. Neither does the act, in terms or spirit, have the remotest bearing on the situation in hand.

We have now considered all the points suggested in the return to the writ of *mandamus,* which seem to merit discussion, except one in respect to nature of the relief appropriate to the case. Prefacing with a brief recapitulation of the status as we find it, will suggest pointedly the nature of such relief. We have seen this:

Secs. 1820, 1826, and 1829 of the Statutes and all parts of the general law as to the power and government of railroad

corporations and sec. 1772 as regards payment of an excise fee, in case of increasing capital stock, are parts of defendant's charter, both by mandate of the general law and that of the special act as well.

On the subject of increasing capital stock the special law and the general laws are in harmony. The change in capital stock in question answers to the calls of sec. 1826 and its nature is not affected by the fact that such section, in substance, was changed from a part of defendant's charter by force of the statute to a part thereof thereby and expressly as well.

The increases of defendant's capital stock are referable to sec. 1826 and the other sections of the statutes mentioned and were intended to be so, and have no different status when squared with the special law, than when with the general law.

An increase of capital stock of a corporation under a law as expressed in sec. 1826 of the Statutes, whether denominated an amendment or not is such in fact and is denominated such in sec. 1820 of the Statutes and treated as such in sec. 1772 of the Statutes.

The excise fee imposed by the statute as a condition of a valid increase of corporate stock, is an incident of a fundamental change in the corporate charter whether made directly by the legislature or by execution of a delegated power to make the change.

A change in the fundamentals of a corporation which it is empowered to make by a statutory method, is an amendment, and the result of the execution of a corporate power, whether such power rests in special or in general legislative grant.

The defendant breached its duty to the state in failing to file with the secretary of state proof of the proceedings in respect to each of the pretended increases of capital stock and neglecting to pay the excise fee of one dollar per thousand dollars as to the several increases.

Regardless of what might be the result of a further neglect to obey the law in respect to such increase of stock, since the

neglect prior thereto has not been wilful nor negligent; but been characterized by good faith, as has also the neglect of the state in respect thereto, and no real damage to the latter or the public will result from such mutual neglect if defendant shall now perform the neglected duty, it should be permitted to do so.

The mere delay under the circumstances, does not involve waiver on the part of the state of the duty of defendant to obey the law nor estop it from insisting upon performance of such duty.

In the circumstances stated, the defendant should be permitted and required to do what it has heretofore neglected to do, and without any unnecessary increase of burden as a condition thereof and the late performance having the effect to validate the increased stock from the beginning by denying the use of judicial remedies to question it or by judicially declaring that the late performance shall have original validity.

As above indicated, the defendant should not be unnecessarily burdened in respect to performing presently the neglected duty. To the end that such end may be logically accomplished as well as that the late performance may clearly have original validity, may not the duty be now done *nunc pro tunc,* as the term is used in judicial proceedings? Counsel for defendant urge that such should be the termination of this litigation in case of conclusions being reached that it breached its duty as we have found was the case.

The *Attorney General* suggests that the power to require a thing to be done, *nunc pro tunc,* applies only to control by a court of its own proceedings with reference to acts done without the proper record having been made or some preliminary essential act being performed; that the court has no jurisdiction to apply that doctrine to such a case as this and thus supersede the requirements of the statute and control the administration by a state officer, who is not before the court and whose duties are prescribed by law.

It is needless to review the authorities cited and others of the same sort respecting the nature and scope of judicial power to permit or order things to be done presently which might, or ought to, have been done before. There are a great variety of judicial sayings on the subject, showing much variety of views, including some suggesting an arbitrary limitation of the power and evidencing a very inadequate conception of the subject. Some of the authorities speak of jurisdictional aspects, and indicate that the only proper function of a *nunc pro tunc* direction is to permit or order correction of the court's records in harmony with things actually done without evidence having been created and preserved necessary to efficiency. Such suggestions are very misleading. It is a common thing for this court to treat a thing as done, where that course is essential to equity, which ought or might have been done, or order the particular thing to be done with original vitality, as for instance treat pleadings as having been amended in accordance with the evidence and so as to support the judgment, summarily, or order the amendment.

True, in general, and perhaps, technically, as it is understood in the law, the judicial function as to *nunc pro tunc* orders appertains to corrections in judicial proceedings. But courts, constitutionally given the broad jurisdiction vested here, possess inherent authority to do things within a very broad field which makes for justice between parties. It is not arbitrarily limited by precedent in respect to what may be ordered or permitted to be done, presently, with original validity, which ought to have been done before. In all such matters the court acts *nunc pro tunc* or in the nature of that. The mere name is of little consequence. The whole subject is within the field of equity wherein the power of this court is too broad for any one to safely venture to place any precise limits upon it.

There are few situations in which the court under its broad power cannot permit a thing to be done with original validity

which, in its wisdom, is essential to the equitable conclusion
of a matter in controversy of which it is possessed for adjudi-
cation, having jurisdiction over the parties. The power is
one thing. Whether it should be exercised in any particular
instance or not is quite another thing. The latter rests in the
broad field of administrative discretion. Here all the parties
concerned are before the court. The state invoked its juris-
diction and submitted to its authority. Neither party with-
out the court's consent could withdraw the subject of con-
troversy from that jurisdiction. . The immediate administra-
tive instrumentalities having to do with such subject, includ-
ing the one designated by law to receive the filing and excise
fee in case of a tender pursuant to the judgment of this court,
are here, in legal effect. The hand of the court reaches as far
as the necessities for execution of its judgment extends. All
that is involved in the submission to the court's jurisdiction.
Having become thus possessed of the matter, the court might,
if justice seemed to require it, deny the relief sought, entirely,
and in such a way as, in practical effect, to give original
validity to the increase of stock. It might grant the relief
asked on condition, or so grant it in part and deny it in part,
or grant it on condition, giving full effect as regards benefit
to defendant upon its doing all it could do to perform the
conditions thereof,—though full performance were rendered
impossible by some act or neglect of the adverse party,—by
so acting upon representative instrumentalities of the real ad-
verse party, as to save the people of the state in their sover-
eign capacity from being prejudiced by any obstruction to
performance by defendant of the conditions imposed upon it,
or otherwise shape the closing of the litigation as justice
might seem to authorize or demand. In short, the power
here, as said before, is as broad as the exigencies of the case.
It is not fenced about by any arbitrary rule of law, written
or unwritten, or rule of practice restraining the supreme rule
that justice should prevail so far as that can reasonably be

accomplished. Within that particular field and within the boundaries of reason, as the court may view the matter, it is the judge of the means, the manner, and the measure of re-dress,—to that end, justice always lighting the way. *In omnibus quidem, maxime tamen in jure, æquitas spectanda sit.*

Wherefore it is thus considered:

*By the Court.*—The motion to quash the alternative writ of *mandamus* is denied. A peremptory writ of *mandamus* is ordered to be issued requiring defendant to file as in the first writ required, and the state through its secretary to receive the documents required to be tendered and file the same on receipt of ninety-five thousand dollars ($95,000) as and for the excise fee of one dollar per thousand dollars of the second increase of stock; the filing and payment to have such original validity as regards the status of the two increases of stock as to preclude the state from using any remedy hereafter against defendant for its failure to seasonably perform its duty in respect to the two increases of stock.

Winslow, C. J. (*dissenting*). My brethren will, I am sure, acquit me of any intentional discourtesy when I say that it seems to me there is a fatal confusion of thought in arriving at the conclusion in this case.

This is not an action by the state to recover fees, but simply an action to compel the defendant to obey the statute requiring corporations to file a copy of each amendment to their articles of incorporation with the secretary of state. The state contends that the defendant has amended its articles of incorporation; the defendant contends that it has not. The question to be solved is therefore very simple, and it would seem that it ought to be very easy of solution when, as here, the evidentiary facts are not in dispute.

The defendant is not a corporation organized under the general railroad incorporation law, which requires the making and filing of articles of incorporation (as was the defendant

State ex rel. Att'y Gen. v. Northern Pac. R. Co. 157 Wis. 73.

in the case of *State ex rel. Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 137 Wis. 80, 117 N. W. 846), but is a corporation created by special act of the legislature. Its "articles" are therefore legislative acts, it has no others. By its original act of incorporation the capital was limited to $10,000,000, but this act was amended by ch. 244 of the Laws of 1895, which provided that the capital stock of the company might be increased from time to time to such an amount as might by its stockholders be deemed necessary for the construction, acquisition, or operation of its railroad or railroads. This power has been exercised by the stockholders, and the question is whether by that act they have amended their articles of incorporation, *i. e.* their charter. There can be but one logical answer to this question, as it seems to me. The charter is exactly the same now as before. If one were now directed to print the articles of incorporation of the defendant, he would perforce print the charter in exactly the same words as he would have printed it if ordered to do so before the increase of capital stock. The stockholders have not committed the folly of attempting to change an act of the legislature,—they have simply exercised a privilege which the legislature gave them, and the law remains exactly as before. One does not change the terms of a power of attorney by doing what it authorizes. Not only have the articles of incorporation remained unchanged, but there is no power short of the legislature that can change them. The difficulties which the court experiences in the case seem to me to be the difficulties which always arise when one fails to give plain words their plain meaning.

BARNES, J.  I agree with the foregoing dissenting opinion.