80  139
106  143
80  139
111  118

## JOHN B. CONLIN v. APPALONIA MASECAR.

### *Equity—Reformation of deed.*

In order to ascertain whether a mistake has been made in describ-
ing property in a deed, it is essential to ascertain the *intent* of
the parties—the one in selling, and the other in buying—as to
the subject-matter of the sale; and if the deed fails to express
*that* intent, there is a mistake which can be relieved against in
equity.

So *held*, where the parcel of land offered for sale was fenced,
and both parties were upon the ground and saw the inclosed
land, which was described to the purchaser as two lots,—it hav-
ing been so described in mortgages which the vendor had pur-
chased, who had afterwards taken a deed containing a like
description,—when in fact one-half of one of the lots was
owned and *occupied* by an adjoining proprietor; and it is held
that the mistake was mutual, and could be corrected in equity.

Appeal from Monroe. (Kinne, J.) Argued January
24, 1890. Decided April 11, 1890.

Bill to reform a deed. Defendant appeals. Affirmed.
The facts are stated in the opinion.

*George M. Landon,* for complainant, contended:

1. The evidence must be clear, convincing, satisfactory; but the
   rule does not require that it shall not be conflicting.
2. Parol proof is admissible to show mistake, and the question is,
   does it satisfy the court? citing *Gillespie v. Moon,* 2 Johns.
   Ch. 585.
3. A deed may be reformed, not only where there is a mistake in the
   omission or insertion of words contrary to the intention of the
   parties, but also where they, understanding the language used
   in the description, believe it to correspond with the actual
   boundaries of the land intended to be conveyed, but are mis-
   taken; citing *Bush v. Hicks,* 60 N. Y. 298.
4. In all cases of mutual mistake, however induced, or of the mis-
   take of one and fraud of the other, courts will reform instru-

ments; citing *Albany Savings Inst. v. Burdick*, 87 N. Y. 40; *DeRiemer v. Cantillon*, 4 Johns. Ch. 85.

5. As to the right of the complainant to file his bill, see *Johnson v. Taber*, 10 N. Y. 319.

*I. G. Humphrey*, for defendant, contended:

1. The bargain relied upon by complainant to reform, if any existed other than the deed, rests in parol, and is within the statute of frauds, and is void, not voidable, and cannot be enforced; citing How. Stat. § 6181.

2. Where it is necessary to make out a contract in writing, parol evidence is inadmissible to supply any defects in the writing; citing *Parkhurst v. Van Courtland*, 14 Johns. 15.

3. No fraud is alleged against the defendant, and the papers were made out according to the intention of the parties at the time. Therefore equity has no jurisdiction to reform the deed.

4. The alleged oral agreement was but a conversation between complainant's agent and defendant's husband, who denies being her agent, neither of whom had power to bind the principals, who could not have insisted on a specific performance; citing How Stat. §§ 6179, 6181, and cases cited.

5. The courts will never reform a deed, or annul and set aside deeds, on a claim that they do not conform to the contract of the parties, unless the evidence is clear and satisfactory, and establishes complainant's right beyond a reasonable doubt; citing *Church v. Logan*, 77 Iowa, 326.

6. It must not only appear that there was an error on both sides, but the mistake must be admitted or distinctly proved; citing *Ludington v. Ford*, 33 Mich. 123, and cases there cited.

CHAMPLIN, C. J. Complainant filed his bill in the circuit court for the county of Monroe, in chancery, to correct a mistake in, and reform, a deed executed by him to defendant, dated May 21, 1879, conveying to her—

"All that certain piece of land situate in the city of Monroe, county of Monroe, and State of Michigan, known and described as 'Lots Number Twenty-three and Twenty-four (23 and 24) of the Studiford Plat,' according to the recorded plat thereof, with the buildings thereon."

The deed contained covenants of seisin and against incumbrances, and a warranty to defend against all lawful claims. The bill also prayed a perpetual injunction

restraining defendant from further prosecuting a suit at law which she had brought against him for breach of covenants in the deed, which was commenced February 6, 1887; and the bill in this case was filed April 4, 1887.

The alleged mistake is in the description of the premises, and consists in conveying the whole of lot 23, when it should have only conveyed the west half of lot 23, and the whole of lot 24. By the Studiford plat, lots 23 and 24 have each a frontage of 50 feet. In 1849, William P. Gale conveyed, by warranty deed, to Richard Stringleman, lot 24, and the west half of lot 23, Studiford plat, giving the boundaries and dimensions as 75x140 feet. This deed was duly recorded. Gale, November 14, 1862, conveyed to George Kronbach lot 22, and the east half of lot 23, bounded west by Stringleman, which deed was recorded November 18 of the same year. Stringleman and Kronbach entered into the possession and occupation of the premises deeded to them respectively. The premises conveyed to and occupied by Stringleman were fenced, which fences have occupied substantially the same position since. There were a house and barn and outbuilding upon the Stringleman premises.

Richard Stringleman died prior to 1872,—the exact date does not appear; and December 16, 1872, his widow and one heir joined in a mortgage upon the premises. This was released July 22, 1873. April 18, 1873, one of the heirs conveyed, by quitclaim deed, the premises to his mother, Elizabeth Stringleman. July 9, 1873, two other of the heirs executed a quitclaim deed to their mother, Elizabeth Stringleman, and therein described the premises as "Lots 23 and 24, Studiford's Plat." On the same day, Elizabeth Stringleman executed a mortgage to W. H. Lacey, describing the premises as "Lots 23 and 24;" and also, on the same day, she executed another mort-

gage to Erastus H. Field, describing the premises mortgaged as " Lots 23 and 24."

Prior to 1878, John B. Conlin, the complainant in this suit, purchased the two mortgages last described, and took assignments thereof. Mrs. Stringleman also made another mortgage, covering in the description two full lots, which was afterwards discharged. On March 26, 1878, Elizabeth Stringleman conveyed to Conlin, by quitclaim deed, the premises, describing them in such deed as " Lots 23 and 24."

Mr. Conlin lived at White Pigeon, in St. Joseph county, and transacted his business at Monroe through his agent and attorney in fact, Edward R. Gilday. Neither Conlin nor Gilday had actual notice of the situation of the title, at this time, save what appeared from the description contained in the two mortgages executed on July 9, 1873, which Conlin had purchased. They had long known the premises occupied by the Stringleman family, embraced within the inclosure.

In the winter or spring of 1879, Mr. Gilday proposed to sell the premises to Dr. A. J. Masecar. Dr. Masecar had resided in Monroe but a short time, and had formed an intimate acquaintance with Mr. Gilday; and they, as well as their families, were on the most friendly terms. At the suggestion of Mr. Gilday, they went to view the premises. The doctor examined the premises,—went through the lower part of the house, and into the front and back part of the lot. Mr. Gilday told him the premises consisted of two lots. There is a serious conflict of testimony as to some things which are claimed by Mr. Gilday to have occurred upon that examination. Mr. Gilday testifies that the question arose as to the width of the premises, and that he, judging of the distance between the fences, said to the doctor that the lots could not be

over 40-foot lots, as he did not think it was over 80 feet between the fences; that the doctor thereupon went to the fence at the south-east corner, and paced across the front of the lot; and that he asked the doctor how much he made it, and he shook his head, and said, "I don't think it is quite that much;" that he said to the doctor:

"I don't know whether it is that or not. I don't know the width of the lots here. They are so described in the papers, and that is all I know."

This part of Gilday's testimony is positively and distinctly denied by the doctor. I do not consider this disputed testimony of much importance. The doctor was then 40 years of age. He had had large experience in building houses,—could tell the dimensions of the house upon these premises; and it would seem, if that question was material to his purchase, that a man with such experience, and with such ability to give dimensions, would readily discern the difference between the frontage of 75 and of 100 feet. The price asked was $1,000. After viewing the premises, the doctor offered $900, which, after a time, was accepted. Mr. Gilday was about to prepare a deed, when the doctor told him to make the deed out in his wife's name, and gave him her name to insert in the deed. After it was drawn, it was sent to White Pigeon for execution, and on its return Mrs. Masecar executed her note and mortgage for a balance of the purchase money; the description in the mortgage following that of the deed, and describing the premises as lots 23 and 24. Mrs. Masecar and the doctor went into possession of the premises, and on November 13, 1883, executed a mortgage upon them to Mary Leonard, describing them as "Lots 23 and 24."

It appears that the two mortgages which Conlin had purchased, given by Mrs. Stringleman, had not been discharged of record; Mr. Gilday considering that they had

merged in the deed from Mrs. Stringleman to Conlin. Dr. Masecar testifies that he found, upon investigation, that the mortgages had not been discharged, and also that somebody else had a deed to the east half of lot 23; that he then went to Mr. Gilday, and requested him to discharge those mortgages, and after some conversation he promised to discharge them; that he asked him at that time how it was that he had sold Mrs. Masecar two lots, when half of one of those lots was deeded to somebody else, and that he—

"Asked if he knew that lot was sold. He said he did. He said he sold Mrs. Masecar just exactly what Mr. Conlin's interest was in that property."

Mr. Gilday denies that part of this conversation relating to the title of the east half of lot 23. It appears by the record that Mr. Gilday discharged the two mortgages mentioned on November 6, 1883. At this time, according to Dr. Masecar's testimony, he knew that Mrs. Masecar had no title to the east half of lot 23; and yet it appears by the record that on November 13, or seven days later, she mortgaged both of the lots, regardless of want of title to the east half of 23, to Mary Leonard. The only importance this testimony has is its bearing upon complainant's delay to bring suit. Both Mr. Conlin and Mr. Gilday testify that they were not aware of the mistake until after the commencement of the suit at law. Mr. Humphrey testifies that he wrote a letter to Mr. Conlin notifying him of his want of title to the east half of lot 23. The testimony as to mailing the letter was not definite, but depended upon the ordinary usage and custom of mailing letters written by his firm. Mr. Conlin testifies he never received it. It is not necessary to recite the testimony at large.

Counsel for defendant claims that the parol testimony showing what Dr. Masecar said and did was incompetent,

for the reason that he was not authorized in writing to act for his wife; that the deed is the only written evidence of the sale and purchase, and that cannot be reformed, unless in accordance with some preceding agreement in writing. I think, under the circumstances of this case, the testimony as to what preceded the writing of the deed was admissible. The doctor represented himself up to the time the deed was drawn, and then he directed his wife's name be inserted. She stepped into his shoes at that point, and is in no better position than he would be in had the deed run to him.

In order to determine whether a mistake has been made in describing the property sold, it is essential to ascertain the intent of the parties—the one in selling, and the other in buying—as to the subject-matter of the sale. If the deed expresses that intent, then there is no mistake which can be relieved from in equity.

The premises which the complainant, through his agent, Gilday, offered for sale, was a parcel of land inclosed by fences. The seller and the purchaser were upon the ground, and the purchaser saw all there was offered for sale. It was described to him as two lots. It would be idle, as well as preposterous, to claim that as the parties stood there, upon the ground, looking at the inclosure, the one intended to sell, or the other to buy, or thought he was buying, a strip 25 feet in width beyond the east fence, then in the occupation of Mr. Kronbach. It appears plainly to me that not only was there a mistake in the description of the property in the deed, but that the mistake was mutual. The defendant has got the identical premises she bought, and all she bargained for. The public records were constructive notice alike to both parties, that the legal title of the east half of lot 23 was in Kronbach. The mistake contained in the descriptions

of the mortgages executed by Mrs. Stringleman in 1873 led Mr. Gilday to believe that the premises were correctly described as "Lots 23 and 24." This was such a mistake as entitles a party to relief in equity. I do not think that the fact that he did not search the record back, when he would have discovered the error, was such negligence as precludes relief, under the circumstances shown in the testimony.

The objection that parol testimony was not admissible to show the mistake is not well taken. The principles governing the introduction of parol evidence to reform written instruments are so well and fully stated in Pom. Eq. Jur. §§ 857–859, 864–867, that we need not incumber this opinion by stating them here.

We think the decree of the circuit court is right, and should be affirmed.

MORSE and GRANT, JJ., concurred. LONG, J., did not sit.