INGRAM DAY LUMBER CO. *v.* ROBERTSON, STATE REVENUE AGENT.

[92 South. 289, In Banc.   No. 22241.]

1. PUBLIC LANDS. *Right of lessee of sixteenth to cut timber is fixed by law.*

   The right of the lessee of a sixteenth section to cut timber thereon is fixed by law, and can neither be increased nor diminished by a board of supervisors or a court of equity except as may be provided by law.

2. EQUITY. *If because of a party's mistake as to an agreement's legal effect it fails to express the contract, equity will relieve.*

   A simple mistake by a party as to the legal effect of an agreement which he executes, or as to the legal result of an act which he performs, is no ground for equitable relief; but if, after making an agreement, the instrument they execute, because of a mistake as to its legal effect, fails to express the contract which the parties actually entered into, equity will interfere with the ap-

propriate relief, either by way of defense to its enforcement, or by reformation or cancellation.

3. PUBLIC LANDS. *An order extending time to cut and remove timber from school land held to confer no greater right than original lease.*

When the lessee of a sixteenth section is without the right to cut timber thereon for commercial purposes, an instrument executed by the president of the board of supervisors, pursuant to an order of the board so to do, extending the time within which the lessee can cut and remove the timber beyond the expiration of the lease, does not confer on the lessee the right to cut and remove the timber where the order under which the instrument was executed expressly provides that it shall confer no greater right to cut and remove the timber than was conferred by the original lease.

4. TROVER AND CONVERSION. *Measure of damages value at time of conversion.*

The measure of damages for the conversion of property is the value of the property at the time of its conversion with interest thereon to the time of the trial.

ANDERSON and SYKES, JJ., dissenting.

APPEAL from chancery court, Hancock county.
HON. D. T. CURRIE, Special Chancellor.

Bill by Stokes V. Robertson, State Revenue Agent, against the Ingram Day Lumber Company. Decree for the plaintiff, and the defendant appeals. Affirmed.

*White & Ford,* for appellant.

The facts are that the board of supervisors first caused a fifteen years lease of this land to be sold and it was bought in by G. W. Walker, all parties believing that the purchaser was buying the timber; and the purchaser intending to buy, and the seller intending to sell the timber.

This is disputed by appellee in his brief, but is shown to be true: (A) By the fact that the lease of the land, without the right to cut the timber, was valueless, and it was obvious that any attempt to lease the land without

the right to cut the timber would be fruitless, and that such lease would not sell for enough to pay the costs of advertising the sale.

(B)   By the fact that immediately after the lease, the purchaser began to cut the choice timber from the land without objection· from the board of supervisors, or the township trustees.

(C)·  By the fact that no other use was ever made or attempted to be made of the leased land.

(D)   By the fact that it was understood that a minimum price of two dollars per acre was to be received for this lease based on the value of the timber.

(E)   By the fact that the board, in fixing a value of the lease, took into consideration as a basis of valuation, the accessibility of the timber to a sawmill.

(F)   By the fact that as soon as the purchaser learned that the lease in its original form did not carry with it the right to cut the timber, they refused to pay the purchase money until formal deeds carrying that right should be executed.

(G)   By the fact that the board of supervisors, by resolution spread on its minutes, admitted the mutual mistake and the intention of the parties as contended for by the purchasers, and ordered deeds to be executed conveying the timber.

(H)   By the fact that the amount of the bids at the sale, as shown by the testimony of H. S. Weston, one of the bidders, was based on the value of the timber alone.

(I)   By the fact that the board of supervisors, the township trustees, and the purchasers at the sale knew that the lease, without the right to cut the timber had no value.

(J)   By the testimony of McGehee, president of the board of supervisors, on cross-examination, to the effect that when they sold the lease they were· undertaking to sell the right to cut the timber, and that they had verbal instructions in reference thereto from the township trustees.

(K)   By the fact that· on no other sensible theory can you account for the action of the board· of supervisors in

first getting the consent of the residents and the inhabitants of the township, then advertising in a newspaper and selling, nor can you on any other sensible theory account for the action of the purchasers in buying at a price at least equal to the value of the timber, a lease which without the right to cut the timber was not worth the paper upon which it was written.

Other evidence of the intention of the parties was offered by appellant, but excluded.

We therefore reiterate the statement made in our original brief that the record in this case shows that the sole purpose of the board of supervisors was to sell the timber and that the procedure had was under the mistaken view that the lease of the land would carry with it the right to cut the timber; that at the sale the vendors intended to sell and believed they were selling and the purchasers intended to buy and believed that they were buying the timber on the land with the lease as a mere incident for the purpose of enabling them to cut it. We further reiterate that the testimony to that effect is undisputed; and we insist that a court of equity would not have been without power to relieve against the obligation for the payment of the large amount of money executed by the purchaser on the one hand, and accepted by the vendor on the other, through mutual mistake as the purchase price for this timber and the purchase price for this timber alone, if appellant had filed a bill to cancel.

The principle involved in the case of *Moss Point Lumber Company* v. *Board of Supervisors* is not in any wise involved in the trial of this cause, nor were the principles that are involved in this in any wise involved in the Moss Point Lumber Company case, nor in the case of *Bridges and Hill* v. *Board of Supervisors,* cited in counsel's brief.

The effect of the decree in the court below is not only to deny to a court of equity the power to correct a mutual mistake where a board of supervisors is a party, and to right the wrong resulting therefrom, but the court in that decree went further and actively intervened to perpetrate

a wrong, or to prevent the righting of a wrong, by invalidating the act of the board of supervisors where that body in the discharge of the duties delegated to it, had in good conscience, righted the wrong resulting from a mutual mistake by effectuating the contract both parties had intended and attempted to make.

Even if this deed was voidable, it was not void, and could not be invalidated without the repayment of the purchase price; and while a court of equity might not in the first instance have reformed the contract and decreed the sale of the timber intended by the parties, we earnestly insist that when the mutual mistake was discovered, and it appeared that the board of supervisors held notes for the purchase money of property which it was authorized to sell, and had intended and attempted to sell, and which the purchaser intended and attempted to buy, but to which through a mutual mistake he got no title, a court of equity was clothed with full authority to relieve the purchaser against the payment of the purchase money of this property he had bought, but did not get; and certainly when the board of supervisors and the grantee of the purchaser themselves consummated the contract which both parties had in mind at the outset by the execution of the deed conveying the title, and the payment of the purchase money the court will not lend its active aid to require appellant to pay the value of this timber to the state after having already paid the purchase money which the complainant still holds.

We submit that so long as courts of equity are guided by the rule of right, they will not lend their aid to such unconscionable wrong as is here attempted, even though the state of Mississippi is to be the beneficiary.

We wish to call the court's attention to the fact that in this case, it will be seen by the record, that in the year 1914, the appellant again bought the timber in consideration of the cancellation of the unexpired lease, and the payment of three hundred and seventy-five dollars, and the president of the board of supervisors duly authorized

by resolution executed a deed conveying the timber to appellant. So whatever may be the decision of the court on the legal questions raised in this case, and its companion case No. 22240 there is no escape from a reversal of the decree in this cause on account of the last purchase and the payment of the purchase price.

*F. C. Hathorn & A. A. Hearst,* for appellee.

Ordinarily, under the facts in this record, there would be no question about the liability of defendant for four thousand, five hundred dollars, the value of the timber agreed upon, with interest from the time it was cut to the date of the judgment. This liability of a tenant of a sixteenth section for waste is fixed by the decisions of our supreme court in the cases of *Warren County* v. *Gans,* 80 Miss. 76, 31 So. 539; *Moss Point Lumber Co.* v. *Board of Supervisors,* 89 Miss. 448, 42 So. 290; *Jefferson Davis County* v. *James-Sumrall Lbr. Co.,* 94 Miss. 530, 49 So. 611. Even the defendant in his answer admits that as an ordinary lessee of the land he had no right to cut the timber. But he undertakes to escape liability upon the pretense that the board of supervisors intended to sell the timber to the original lessee when in fact the board made an ordinary 15 year lease. In other words, the defendant's only hope of escape is his attempt to show that while the board of supervisors made a 15 year lease of the section they intended to sell the timber.

But what are the facts? The board acted and proceeded in leasing this section in every particular in strict compliance with the provisions and requirements and authority of chapter 40, Laws of 1898 and the sections of the Code of 1892, governing the leasing of sixteenth section lands.

The first step was to take the sense of the inhabitants of the township for the leasing of this sixteenth section as required by section 4159, Code of 1892, and the certificate of the township trustees was spread upon the minutes of the board at its "next," October, 1899, "meeting" as

required by the said statute. The next step by the board was at the January, 1900, meeting when they acted upon this petition and ordered the section to be leased at public outcry for 15 years under the provisions of chapter 40, Laws of 1892; next the superintendent of education of the county, pursuant to this order and acting under section 4154, Code of 1892, advertised the sale of a 15 year lease of the section to be made at public outcry etc. and, pursuant to this notice and the section of the Code referred to, he did lease the land to G. W. Walker for a term of 15 years at a public sale at the court house for certain rentals to be paid annually during the 15 years and made his report of this sale to the board of supervisors, and the board approved the sale and ordered him to execute a lease to Walker upon Walker's executing 15 annual rent notes with good securities to be approved by the board at its next meeting; next the purchaser, Walker, executed his 15 annual rent notes with endorsers thereon and the board at its May, 1900, meeting approved the notes and the endorsers thereon and ordered the superintendent to execute a lease to Walker; next the superintendent of education in compliance with this order of the board, executed to Walker an ordinary lease of the section for a term of 15 years.

So that the board of supervisors followed the law precisely in making this lease—they complied with the statutes in every respect and in every detail.

And yet the defendant tries to say that while the board of supervisors and the superintendent of education went through and followed this long and tedious procedure marked out by the statute for leasing the land, they did not intend to lease the land at all but simply intended to sell the timber.

This contention of defendant falls of its own awkwardness because the acts and proceedings of the board of supervisors, as evidenced by their minutes, are conclusive as to what they did and what they intended to do.

This is a rule everywhere followed and especially in our own state. We need cite no authority nor make extended argument in support of this proposition of law. It is elementary horn book law and a mere statement of the rule is sufficient authority and argument to support it.

It follows then that the oral evidence offered by defendant through the witnesses Weston and McGehee, members of the board of supervisors that had and recorded these proceedings, to the effect that they intended thereby to sell the timber rather than to lease the land, was inadmissible because this evidence was in plain conflict with the minutes of the board.

"Even the legislature has no power to pass an act putting a particular construction on another act, that is a judicial duty and power—" *Planters Bank* v. *Black,* 11 S. & M. (Miss.) 43.

Two prominent outstanding rules are applicable to this case, and these two rules are controlling. The first is a rule of evidence which makes the minutes of the board of supervisors conclusive evidence of what they did and intended to do; and the second is a rule of construction which leaves to the court the duty and function of determining by judicial construction what the board accomplished and intended to accomplish by its proceedings as evidenced by its minutes. When complainant offered in evidence the minutes of the board and the lease, as set out at page 29 *et seq.* of the record, the book of evidence of what the board did and intended to do was closed; and it was left for the court to determine by judicial construction, unaided by further evidence, what the board really accomplished and intended to accomplish by these proceedings. It is defendant's confusion of these two rules and his misapplication of them to the case that has led him into false paths. See *Keenan* v. *Hoskins* (Miss.), 35 So. 177; 7 Am. & Eng. Ency. Law (2 Ed.), p. 1008.

The question of law raised by appellant in his answer and in his attempt to avoid the effect of the orders of the board of supervisors and the lease reflected at page 29 *et*

*seq.* of the record by the oral testimony of Weston and McGehee is thoroughly well settled in Mississippi in the case of *Bridges & Hill* v. *Board of Supervisors,* 58 Miss. 817, Code of 1871, sections 1361-1389; *Crump* v. *Supervisors,* 52 Miss. 107; *Howe* v. *The State,* 53 Miss. 57; *Moss Point Lumber Company* v. *Board of Supervisors,* 42 So. 290, 89 Miss. 448.

We submit, therefore, that under the law as laid down in the Moss Point Lumber Company case appellant's only defense now urged before this court must fail.

We now come to the consideration of the defense urged by defendant in the court below, but which seems to have been abandoned in this court. We refer to the resolution of the board of supervisors set out at pages 60-62, inclusive, of the record, and the timber deed set out at page 68 thereof.

This order and the deed show on their face that the only consideration to support the deed is the payment of the bid of Moores at the judicial sale set out in the proceedings copied at pages 49, *et seq.* of the record, and of the nominal sum of one dollar, chapter 41, Laws of 1898, authorize the board of supervisors to sell the timber. This could not be held to authorize the board to dispose of the timber without lawful consideration, because to sell presupposes a consideration good in law. This is particularly true when it is remembered that the board is acting and dealing with a delegated public trust, over which they are not permitted to act with the freedom of individuals. Unless, therefore, it appears that there was a consideration valid in law for this timber deed, it is void, and conveyed to Moores, and appellant, as his successors in claim of right, no title to the timber.

This leads us to a consideration of the question as to whether the payment by Moores of his bid at the judicial sale for the lease of Walker could constitute a sufficient consideration to support this timber deed, an independent contract. We unhesitatingly say that it could not support this timber deed if this bid was his legal obligation This leads us then to the further inquiry, was Moores'

bid at the judicial sale a subsisting legal obligation which he was bound to pay irrespective of the timber deed? Unquestionably it was, and the court could have compelled him to make it good by rule or attachment. *Camden v. Mayhew,* 129 U. S. 73, L. Ed. 608; *Allen v. Martin,* 61 Miss| 78; *Mitchell v. Harris,* 43 Miss. 314; *Patterson v. Josselyn,* 43 Miss. 373. The commissioner's report shows a fair sale, that Moores and sundry other persons appeared and bid on the lease and that he was the highest bidder, and that he expressed a willingness to comply with his bid upon the confirmation of the sale and tender of a deed. The decree of confirmation finds, as a matter of fact, that Moores bid to pay two thousand eight hundred and sixty dollars for the lease, and that the said lease sold for a fair and reasonable price, and that no objections were made to the confirmation. The commissioner's deed shows that Moores paid his bid and got by his deed what he bought at the sale—a lease not the timber. Moores is concluded by these confirmation proceedings. *Deputron v. Young,* 134 U. S. 241, 33 L. Ed. 923. Since this bid for the unexpired portion of the lease was his legal obligation which he was bound to pay, the payment thereof by Moores to the commissioner could not support or become a consideration for the new contract—the timber deed. The performance of a legal duty or the doing of a legal obligation is not a sufficient consideration for a contract. *Bell v. Oat* (Miss.), 53 So. 491 (not officially reported); *Keith v. Miles,* 39 Miss. 442, 77 Am. Dec. 685; *Hunt v. Knox,* 34 Miss. 655; *Enry v. Sauer,* Am. Ann. Cas. 1913C. 241; 1 Elliott on Contracts, par. 215; 13 Corpus Juris, pars. 20708-9-10.

Again, this bid being the legal obligation required of Moores was necessary to be paid, to support his commissioner's deed to the unexpired lease, ought to have been collected under the provisions of section 100 of the Constitution and it would be a violation of this section of the Constitution to use this consideration to support the timber deed.

For these reasons this timber deed was without consideration and void, and afforded defendant no protection from liability for cutting the timber.

## INTEREST.

Appellant's contention in this case that complainant was not entitled to interest from the date of the completion of the conversion of the timber, as shown by the agreed statement of facts, to the date of entry of the decree is based upon the idea that there is no statutory provision for such allowance, and he cites as authority, from Mississippi, the case of *Railroad Co.* v. *Adams,* 78 Miss. 893, 29 So. 996. He makes no argument in support of his contention and cites only the one Mississippi case which is not in point, either in fact or by analogy, and looses sight of the fact that the authority in Mississippi in cases involving the injury or destruction of property follows the general rule as laid down at page 1500 in 22 Cyc. where the rule is stated to be:

"While it has been laid down in many cases that interest will not be allowed on damages recovered for torts to property, unless defendant has derived some benefit from his tort, or has been guilty of gross negligence, the general rule supported by the great weight of authority is, that in cases of torts to property, interest on the damages may be allowed as a part of the damages and as an approximately uniform measure of compensation—"

In support of this general rule Cyc. cites a great many authorities from the states of Alabama, Arkansas, California, Connecticut, District of Columbia, Florida, Georgia, Indiana, Iowa, Maine, Massachusetts, Michigan, Minnesota, Mississippi, (*Illinois Cent. R. R. Co.,* v. *Haynes,* 64 Miss. 604, 1 So. 765, Nebraska, New Hampshire, New York, North Carolina, Ohio, Pennsylvania, Texas, Utah, Vermont, Wisconsin, United States, and England. 1 Suth. Dam., 174; *Fremont, E. & M. V. R. Co.* v. *Marley,* 25 Nev. 138; *Mote* v. *Chicago & N. R. Co.,* 17 Iowa 22; *Sayre* v. *Hewes,* 23 N. J. Eq. 652; *Derb* v. *Gallup,* 5 Minn. 119.

An interesting review of the authorities on this question is found in the case of *Wilson* v. *City of Troy,* 135 N. Y. 96, 32 N. E. 44, 31 Am. St. Rep. 817, 18 L. R. A. (old) 449.

We now come to the decision of our own court upon this question of the measure of damages for the wrongful taking and conversion of the property of another. In the case of *Whitfield* v. *Whitfield,* 40 Miss. 352, Mr. Justice HARRIS, after an exhaustive review of the authorities from other states, states the rule thus:

"From the examination which we have been able to give to this question, we think that it may be safely affirmed.

"1.   That in actions for taking and detaining personal property, where no question of fraud, malice, oppression (or wilful wrong, either in the taking or detention) intervene, the measure of damages is the value of the property at the time of the taking, or conversation or illegal detention, with interest thereon to the time of the trial; and this is a rule of law to be decided by the court."

In the case of *Bickell* v. *Colton,* 41 Miss. 368, this same rule is quoted and followed with approval. And in the case of *Jamison* v. *Moon,* 43 Miss., 598, which was a case of the innocent though wrongful, taking and conversion of 3 bales of cotton. *Taylor* v. *Morton,* 61 Miss. 24; *Illinois Central Railway Company* v. *Hayes,* 64 Miss. 604, 1 So. 765.

Thus it appears from these authorities that the law in this state is that for the wrongful taking of property the owner may recover from the wrongdoer the value of the property at the time the same was taken and converted by him with interest from the time of the wrongful taking. And that this rule rests upon the idea of just compensation to the injured party, and he is entitled to its recovery as a matter of law.

SMITH, C. J., delivered the opinion of the court.

The appellee exhibited an original bill in the court below against the appellant to recover the value of certain tim-

ber cut and removed by the appellant from the east half of section 16, township 6, range 14 west, in Hancock county. The cause was heard on bill, answer, and proof, and a decree was rendered in accordance with the prayer of the bill. The facts are practically undisputed, and are in substance as follows:

In 1900, pursuant to permission so to do from the heads of families residing in the township as required by section 4159, Code of 1892, and with the approval of the board of supervisors, as required by section 4154, Code of 1892, the superintendent of public education of Hancock county, after due publication thereof, offered at public outcry to lease section 16, township 6, range 14 west, for a period of 15 years, and, G. W. Walker having bid two dollars and sixty cents per acre therefor, the highest bid made, a lease to the land was executed to him by the superintendent in an exchange for his 15 promissory notes, one due each year, aggregating the amount of his bid. The board of supervisors in authorizing and approving this lease, and Walker in accepting it, were of the mistaken opinion that the lessee of a sixteenth section has the right to cut and remove the timber therefrom for commercial purposes, which supposed right in the lessee influenced both the members of the board of supervisors in approving the lease and Walker in bidding for it, though neither actually communicated that fact to the others, and there were no negotiations among any of the parties with reference thereto. What the superintendent of public education or the heads of families of the township thought about the lessee's right to cut and remove the timber does not appear. The land at the time it was leased to Walker was valuable only because of the timber growing thereon; that is to say, there was no demand then for it for the purpose of being farmed or put to other similar use. Under chapter 41, Laws of 1898, which now appears as section 4702, Code of 1906 (section 7512, Hemingway's Code), boards of supervisors have the power to sell the timber on sixteenth sections without consulting the heads of families of the township. Walker

died without paying any of his notes executed by him for the lease of the land, and, pursuant to a bill in equity filed against his administrator and heirs at law for that purpose, the land was sold for the payment of the notes, and purchased by J. H. Moores. Before the sale to Moores was confirmed the board of supervisors at his request passed a resolution setting forth the leasing of the land to Walker, and that "whereas, said lands were and are only valuable for the lumber thereon, and the board and the lessee supposed the latter had the legal right to cut and remove said timber, and the purchase money given for said leases was based on the supposed existence of said right," and directing the president of the board to execute a conveyance to J. H. Moores of "all the merchantable timber" thereon, "on the payment of one dollar cash and the payment of the amount of his bid for the unexpired lease of said George Walker." The report of the commissioner appointed by the court to make the sale was confirmed by the court, the amount of his bid for the land was paid by Moores, and a deed thereto was executed to him by the commissioner, and the president of the board of supervisors, pursuant to the order of the board hereinbefore referred to, executed to Moores an instrument purporting to convey to him the merchantable pine timber on the land, with the right to remove it therefrom during the life of the lease.

. In December, 1914, the lease to the east half of the section having by mesne conveyances from Moores become vested in the appellant, the board of supervisors passed an order reciting the conveyances hereinbefore referred to, and that the appellant proposed to pay "the sum of three hundred and seventy-five dollars in cash and surrender the remaining years of the term of 15 years granted as aforesaid in which to cut and remove said timber, if, in consideration thereof, the said board will now make and enter an order extending the time for cutting and removal of said timber, and for entering upon the said lands for the said purpose for seven years from date; that is to say, the merchantable timber on said east half of said section

16, township 6 south, range 14 west, to the said Ingram Day Lumber Company for said period in consideration of the cancellation by them of the remaining time before mentioned under said old lease and sale and the cash payment aforesaid; . . . said proposal of Ingram Day Lumber Company be and the same is hereby accepted and the president of this board is hereby authorized and directed to make, execute, and deliver for the consideration aforesaid (three hundred and seventy-five dollars) a deed to all the merchantable timber on the said east half of the section 16, township 6 south, range 14 west, and granting unto said Ingram Day Lumber Company or their assigns a period of seven years from this date in which to cut and remove said timber all as by statute in such cases is provided. Provided that nothing herein shall be construed to confer a greater right on the said Ingram Day Lumber Company than was conferred by the original orders and conveyances herein above referred to, the sole purpose of this order and the deed herein authorized to be executed being to extend the time granted by the above-mentioned conveyance for the cutting and removing of the timber from said land."

The president of the board of supervisors, pursuant to this order, which was made about six months before the expiration of the lease, conveyed the merchantable timber on the land to the appellant with the right to remove it within seven years from December 8, 1914. The timber was cut and removed by the appellant between January 1 and May 1, 1915. The recovery awarded the appellee was for the value of the timber at the time it was cut and removed, with 6 per cent. interest to the time of the trial.

The contentions of counsel for the appellant in effect are: (a) That it was the intention of the board of supervisors in approving the execution of the lease to convey, and of Walker in accepting the lease to purchase, the timber on the land, and the board had the right to effectuate this intent by thereafter conveying the timber to Walker's successor in title. (b) The instrument executed to the appellant by the president of the board of supervisors conveyed

the timber to the appellant for a new and valuable consideration, to wit, three hundred and seventy-five dollars in cash, and surrender by the appellant of the unexpired portion of the lease. (c) The appellee is not entitled to interest on the value of the timber cut and removed.

1. Leaving out of view the questions raised by counsel for the appellee relative to the competency of the evidence, and the effect of the declaration on the minutes of the board of supervisors that the members of the board and Walker thought that the lessee of a sixteenth section would have the right to cut and remove the timber therefrom, it is manifest that the contract intended to be entered into by all of the parties thereto was not a sale of the timber, but a lease of the land. That the members of the board and Walker thought that Walker would have the right under the lease to cut the timber on the land for commercial purposes neither conferred nor authorized the board to confer that right upon him, for the rights and obligations of the lessee of a sixteenth section are fixed by law, and can be neither added to nor subtracted from by a board of supervisors, except as may be provided by law.

But it is said by counsel for the appellant that a court of equity would have reformed the lease so as to make it convey to the appellant the right to cut and remove the timber from the land. Consequently the board of supervisors had the right to execute the conveyance of the timber, for the reason that it could do voluntarily that which a court could have coerced it into doing. If a court of equity would have granted the relief here claimed it would necessarily have in effect canceled the lease, and caused a conveyance of the timber to be executed; for, if the lessee should retain the lease, no reformation thereof could vest him with the right to cut the timber for commercial purposes, for the right of a lessee of a sixteenth section to cut and remove timber therefrom is fixed by law, and no court has the power to increase it. So that even if the board of supervisors here could have done voluntarily that which a court of equity could have coerced it into doing, at most it

could only have conveyed the timber on the land to the lessee on the surrender by him of his lease to the land, and this was not done, for, as hereinbefore set forth, the lessee held on to his lease, and obtained from the board a conveyance of the timber.

But a court of equity would not have reformed the instrument executed and delivered to Walker by the superintendent of public education so as to make it a conveyance of the timber growing on instead of a lease of the land. The mistake which occurred here, and which the conveyance by the board of the timber was intended to correct, was as to the legal effect of the lease; in other words, a mistake of law, and not of fact. That the mistake was one of law does not necessarily mean that it could not have been corrected in a court of equity, for, within certain limits, a court of equity will correct such mistakes. Without attempting to lay down a universal rule by which it can be determined whether a given mistake of law can or cannot be corrected in a court of equity, it will be sufficient to say that:

"The rule is well settled that a simple mistake by a party as to the legal effect of an agreement which he executes, or as to the legal result of an act which he performs, is no ground for either defensive or affirmative relief. . . . If, on the other hand, after making an agreement, in the process of reducing it to a written form the instrument, by means of a mistake of law, fails to express the contract which the parties actually entered into, equity will interfere with the appropriate relief, either by way of defense to its enforcement, or by cancellation, or by reformation, to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact. In this instance there is no mistake as to the legal import of the contract actually made; but the mistake of law prevents the real contract from being embodied in the written instrument." 2 Pomeroy's Equity (4th Ed.) sections 843 and 845; *Sparks* v. *Pittman,* 51 Miss. 511; *Goodbar* v. *Dunn,* 61 Miss. 618; *Hall* v. *Lafayette County,* 69 Miss. 529, 13 So.

38; *Wise* v. *Brooks,* 69 Miss. 891, 13 So. 836; *Canning Co.* v. *Ott,* 88 Miss. 771, 41 So. 378; *Hunt* v. *Rhodes,* 1 Pet. 1, 7 L. Ed. 27, 28 L. R. A. (N. S.) 799, note.

If Walker had purchased the timber in accordance with the statute providing therefor, and the instrument by which his purchase was reduced to written form, because of a mistake as to its legal effect, had failed to convey the timber, a court of equity would have corrected it so as to conform to the agreement actually made, provided a court of equity has the power to reform a contract made by a board of supervisors, as to which we express no opinion; but the mistake here, as heretofore pointed out, was not of that character. The agreement made was for, and the instrument executed pursuant thereto was, a lease, and that the parties thereto may have been mistaken as to its legal effect, and would not have made it had they properly underly understood it, is no ground for equitable relief; for:

"If an agreement is just what the parties intended it should be, no matter what led to it; there can be no interference with it." *Hall* v. *Lafayette County, supra.* "It is not what the parties would have intended if they had known better, but what did they intend at the time, informed as they were." *Wise* v. *Brooks, supra.*

*Hall* v. *Lafayette County, supra,* relied on by the appellant, is not in conflict but is in accord herewith. In that case Hall, a county treasurer, and his sureties, as the court was careful to point out, contracted to give and thought they had given "a bond sufficient in its penalty and its term to cover all moneys that should be in his hands from every source," but, because of a mistake as to the legal effect of the bond given, that contract was not carried out; consequently the decree of the chancery court reforming the bond so as to make it conform to the contract pursuant to which it was given was affirmed.

2. The instrument executed to the appellant by the president of the board of supervisors in December, 1914, by the express provision of the order of the board under which it was executed and accepted, conferred no "greater

right" to cut and remove the timber than was conferred by the original lease and subsequent agreement with Moores, except that the time within which the timber could be cut and removed was thereby sought to be extended seven years. In other words, the agreement extended the time for cutting and removing the timber, provided the appellant then had the right under the lease and subsequent agreement with Moores to cut and remove the timber during the life of the lease, and, as hereinbefore set forth, neither the lease nor the subsequent agreement with Moores conferred on Moors and his grantees any such right.

3. The measure of damages for the conversion of property is the value of the property at the time of the conversion, with interest thereon to the time of trial. *Hinds* v. *Terry,* Walk. 81; *Texada* v. *Camp,* Walk. 150; *Whitfield* v. *Whitfield,* 40 Miss. 352; *Bickell* v. *Colton,* 41 Miss. 369; *Jamison* v. *Moon,* 43 Miss. 602; *Taylor* v. *Morton,* 61 Miss. 24.

*Affirmed.*

Anderson, J. (dissenting.) I am constrained to dissent from the majority opinion.

In 1900, when the board of supervisors leased the half section of land in question to Walker, as well as in 1902, when Moores bought Walker's lease at its foreclosure sale (Walker and Moores being predecessors in title to appellant), said land was of little value, if any, except for the pine timber thereon. It had no value for agricultural purposes, nor as pasturage land, for it was surrounded by hundreds of thousands of acres of free pasturage lands.

At that time chapter 40, Laws of 1898, as well as chapter 41, Laws of 1898, was in force. The former authorized, through the joint action of the township heads of families, their trustees, and the board of supervisors, the leasing of the sixteenth section lands, while the latter statute authorized, through the action of the board of supervisors alone, the sale of the merchantable timber standing on such lands. On the 8th day of May, 1900, this half section

of sixteenth section lands was leased to said Walker for a term of 15 years, for an aggregate rental of one thousand six hundred sixty-six dollars and six cents, payable in 15 equal installments. In making this lease it was the admitted purpose of the board of supervisors (through whom under the statute the lease was consummated) to convey to Walker, the lessee, the right to cut and remove from said land the merchantable timber thereon. The minimum price fixed by the authorities representing the sixteenth section lands, for the sale of this lease was based alone on the value of the merchantable timber standing on the land. No regard whatever was had for the value of the land, for it had no sale value. And it was the purpose of said lessee by his said lease to purchase alone the merchantable timber on said land. He knew that without that right this lease would be of little, if any, value. Both parties to the contract thought under the law the lessee got such right. At that time *Warren County* v. *Gans,* 80 Miss. 76, 31 So. 539, in which the court held that the lessee of sixteenth section lands had no right to cut and remove therefrom the merchantable timber, had not been decided. The minds of the parties met; there is no doubt from the record in this case about that. For the sum of one thousand six hundred sixty-six dollars and six cents to be paid by the lessee, Walker, the lessor, the county, sold said Walker the standing merchantable timber on this land. There was no misunderstanding between the parties about that. The mistake they made was they chose the wrong means to express their intention. The form of the transaction should have been a sale and conveyance under said chapter 41, Laws of 1898. Probably they did not know of the existence of that statute, for it was new, such a statute having been passed for the first time in 1898, while the leasing statute was doubtless very familiar to the parties, for there had been such a statute in force and sixteenth section lands leased thereunder for more than 50 years.

The Walker lease was foreclosed through the chancery court in 1902 to enforce payment of the purchase money

therefor. It was bought at the foreclosure sale by said Moores, who paid therefor two thousand eight hundred and sixty dollars. But, before paying his bid, and before the confirmation of said sale by the chancery court, Moores was doubtless informed of the decision of this court in *Warren County* v. *Gans, supra,* which was decided only a few months before (March term, 1902), in which it was held in this state for the first time that a lease of sixteenth section lands did not carry with it a right in the lessee to cut and remove therefrom the merchantable timber; for the board of supervisors made an order reciting that it was the purpose of the parties in making the said lease to Walker to give the lessee the right to cut and remove the merchantable timber from said land, and, a doubt having arisen as to whether such right was conveyed, etc., and then proceeded to authorize the president of the board, in consideration of the purchase money paid for said lease, to convey to said Moores, under said chapter 41, Laws 1898, the merchantable timber on said land, which was accordingly done. The Walker lease was sold at foreclosure on the 10th of March, 1902; said order of the board of supervisors authorizing its president to make Moores a deed, under chapter 41, Laws 1898, to the merchantable timber on said land, was entered at its June, 1902, meeting; the commissioner's report of said of said lease to Moores was confirmed by the chancery court August 1, 1902; and the commissioner's deed to Moores conveying the lease was made August 26, 1902; and the deed from the board of supervisors to Moores, executed in pursuance of said order of the June term, 1902, conveying the latter the merchantable timber on said land, was made by the president of the board November 3, 1902.

Appellant by *mesne* conveyances succeeded to the rights of Walker and Moores under said lease and conveyance of the merchantable timber on said land, and in 1915 cut and removed same therefrom, of the value of four thousand five hundred dollars, for which appellee got a decree in the court below.

It should be borne in mind that the state proceeds in this
cause by a bill in equity and that it seeks to repudiate said
deed from the county to Moores made in 1902, and re-
cover from appellant the value of the merchantable timber
cut by it from said land in 1915, which was shown to be
four thousand five hundred dollars and at the same time
retain the two thousand eight hundred and sixty dollars
paid by Moores for such timber in 1902, which was its
then value.    If this were a cause between individuals—if
the state were not a party—could there be any doubt that
the party occupying the position of the state in this case
would be estopped by his deed?   It seems that the question
answers itself.   Appellant contends that in a cause of this
kind the state is bound by the same rules of law as would
govern an individual similarly situated, and in support of
that view cites *Bruce* v. *Jones,* 117 Miss. 207, 78 So. 9, in
which Justice STEVENS said: "The state  .  .  .   should
be bound by the same high standards of morals and equity
as the state exacts of its citizens generally in their dealings
one with the other."

I have seen fit to pursue the subject further than did
counsel for appellant.   I find from the authorities that
in determining the question the controlling consideration
is whether in the given case the state was acting in its
private capacity or in its governmental capacity, and, if
the former, the state stands before the courts just like an
individual, while, if the latter, it is in many respects a
favored suitor.   In leasing, or conveying the sixteenth
section lands the state or the county, which is but a sub-
division of the state, acts not in its governmental capacity,
but as a private land proprietor.   The state, in the ab-
sence of constitutional or statutory restrictions, may dis-
pose of its property like any other owner when acting in
its proprietary capacity, and in its capacity as private
owner of lands it is bound by the same rules as its citizens;
it is bound by the recitals in its deed to the same extent
that a citizen would be; it is presumed to have full knowl-
edge of the facts recited in such deed; and such a convey-

ance cannot be attacked collaterally, but only in a direct proceeding in a court of equity for that purpose, provided, of course, the grant is not void on its face. 25 R. C. L. section 23, pp. 390, 391. The principal is stated thus in 21 C. J. section 190, pp. 1186, 1187:

"There is ample authority for the general rule that the rights of the public may be measured and adjudicated by the doctrine of estoppel and other principles and rules of law and equity applicable to the like rights of individuals under similar circumstances, or, as sometimes stated, that an equitable estoppel may be invoked against the United States, a state, a municipal corporation, or other governmental agency or instrumentality in respect of acts done in its so-called proprietary or private capacity, as distinguished from its so-called governmental or public capacity in the strict scope of which it cannot be estopped; and a failure to observe this distinction or to recognize and point out the absence of one or more of the essential elements of a perfect estoppel may be the reason for decisions and dicta which apparently deny this applicability of the doctrine of equitable estoppel."

And in a note to the above reference to Corpus Juris it is said:

" 'The great weight of authority, the stronger reasons and the settled rule upon this subject in the courts of the United States, is that, . . . when a sovereignty submits itself to the jurisdiction of a court of equity and prays for its aid, its claims and rights are judicable by every other principle and rule of equity applicable to the claims and rights of private parties under similar circumstances.' *Iowa* v. *Carr*, 191 Fed. 257, 266, 112 C. C. A. 477. 'It is difficult to find a reason why the state, though sovereign, should not submit her pretensions to those rules which have been established, as necessary and proper to determine and secure the rights of her citizens. The rule is founded upon the most pure morality; its authority is universally acknowledged.' *Com.* v. *Smith*, 4 Pa. L. J. 121, 124, 125. 'The government may not in conscience ask a

court of equity to set on foot an inquiry that, under the circumstances of the case, would be an unfair or inequitable inquiry. The substantial considerations underlying the doctrine of estoppel apply to government as well as to individuals.' *U. S.* v. *Stinson,* 125 Fed. 907, 910, 60 C. C. A. 615, (affirmed 197 U. S. 200, 25 S. Ct. 426, 49 L. Ed. 724). To do otherwise would be inequitable. *Utah Power Co.* v. *U. S.,* 230 Fed. 328, 144 C. C. A. 470; *U. S.* v. *Williamette Valley, etc., Wagon Road Co.,* 54 Fed. 807.

"Resolute good faith should characterize the conduct of the public in dealings with individuals, and there is no good reason in morals or in law that will exempt it from the doctrine of equitable estoppel. *State* v. *Milk,* 11 Fed. 389, 11 Biss. 197."

And these principles apply not alone to the federal and state governments, but with equal force to municipal corporations, counties, townships, and other *quasi*-municipal corporations. 21 C. J. section 192, pp. 1189, 1190. In such transactions the state is subject to the doctrine of estoppel by deed to the same extent that an individual would be under similar circumstances. In 21 C. J. section 102, p. 1106, in discussing this question, the author states that the courts generally hold that the doctrine of estoppel by deed applies to the state, and also to municipal corporations, neither of which can assert anything in derogation of its grant, but in that connection states that the principal has no application to tax sales by the state, because in making such sale the state acts in its governmental capacity, and not as a private landowner. In 15 C. J. section 225, p. 539, in discussing the question of the conveyance of property by a county, it is said:

"Indeed, where no limitation, by statute or otherwise, is placed on the county board or court in the exercise of its judgment as to the consideration for a disposition of county property, nothing short of fraud, or such gross inadequacy as will be equivalent to fraud, is sufficient to invalidate the order of the county board or court directing

a conveyance. Mere inadequacy of consideration is not sufficient to establish fraud."

In *Caruth* v. *Gillespie*, 109 Miss. 679, 68 So. 927, it was held that the state as a private landowner was subject to the doctrine of laches; and the authorities elsewhere to that effect are numerous. See *State* v. *N. P. R. R. Co.*, 157 Wis. 73, 147 N. W. 219; *State* v. *Livingston*, 164 Iowa, 31, 145 N. W. 91; *Pittsburg Ry. Co.* v. *Garrick*, 259 Pa. 333, 103 Atl. 106; *In re Bailey's Estate*, 241 Pa. 230, 88 Atl. 428. It necessarily follows from the authorities above referred to that the sovereign, as to all transactions with its citizens in its private, nongovernmental capacity, is subject to the same principles of law and equity which it prescribes for its citizens in like dealings with each other. This, of course, includes among other principles the doctrine of estoppel by deed, equitable estoppel, laches, that he who seeks equity must do equity, the reformation and cancellation of instruments.

Applying these principles to the present case, why is not the county estopped by its deed to Moores to the merchantable timber in question? There was a valuable consideration for the deed. The county had two thousand eight hundred and sixty dollars of Moores' money for which he had received nothing of value. Moores and appellant of course succeeded to the rights of Walker; the latter had the right through a court of equity to reform his lease contract on the ground of mutual mistake, and have made out of it a conveyance of the timber, as intended; and for the same reason he had the right, if he so chose, to have said contract canceled and set aside, and, if sued by the county on the lease notes, he could have successfully defended on the ground that under the law the consideration therefor never passed. The power of courts of equity to so deal with contracts as to make them carry out the intention of the parties is almost unlimited.

When the legal effect of the terms of the contract agreed upon, through a misapprehension or ignorance of their import, results in a contract different from that really

entered into by the parties, a court of equity will reform such contract. *Orr* v. *Echols,* 119 Ala. 340, 24 So. 357; *Moore* v. *Tate,* 114 Ala. 582, 21 So. 820; *Conlin* v. *Masecar,* 80 Mich. 139, 45 N. W. 67; *Everett* v. *Jones,* 14 N. Y. Supp. 395. The rule of equity that relief will not be granted to correct mistakes of law has no application to mistakes in the language of the contract, or the choice of the form of an instrument whereby it has an effect different from the intention of the parties. *Stafford* v. *Fetters,* 55 Iowa, 484, 8 N. W. 322. Where a written instrument fails to express the intention of the parties, a court of equity will grant relief either affirmatively, by reforming or canceling the contract, or by way of defense to its enforcement; and under this rule relief will be granted by a court of equity from a mutual mistake as to the legal effect of an instrument, as well as from a mistake of fact. *Zieschang* v. *Helmke* (Tex. Civ. App.), 84 S. W. 436; *Lucas,* 30 Ga. 191, 76 Am. Dec. 642; *Adair* v. *McDonald,* 42 Ga. 506; *Allen* v. *Elder,* 76 Ga. 674, 2 Am. St. Rep., 63; *Hopwood* v. *McCausland,* 120 Iowa, 218, 94 N. W. 469; *Welch* v. *Welch,* 13 Ky. Law Rep. 639; *Kennard* v. *George,* 44 N. H. 440; *Evants* v. *Stode,* 11 Ohio, 480, 38 Am. Dec. 744; *Globe Ins. Co.* v. *Boyle,* 21 Ohio St. 127.

In the case of *Hall* v. *Lafayette County,* 69 Miss. 529, 13 So. 38, Hall had given a general bond as county treasurer, but had failed to give a special bond as required by the statute for the school fund. Neither he nor his sureties knew that a special bond for the school fund was required by law; but the minds of the parties met on the proposition that a bond was being executed to cover all funds which might come into Hall's hands as county treasurer. He defaulted as to the school funds, and perhaps other moneys, and suit was brought on the general bond by which it was sought to reform the same so as to make it cover the school funds as well as other funds coming into the hands of said treasurer. The defense was made by the sureties that a court of equity would not reform a con-

tract resulting from a mutual mistake of law.   The court said:

"It is incontrovertible that Hall and his sureties intended to give a bond sufficient in its penalty and its terms to cover all moneys that should be in his hands from every source.   They contracted for that, and designed in good faith to carry out the contract, and thought they had done so, and it was an afterthought to escape liability because only one bond was given.   True, there was no formal and express agreement between the obligors in the bond and the officials as to its terms, but it was as plainly implied from what occurred as if it had been expressed.   Such was clearly the intention of all concerned, and it should not fail of execution by reason of ignorance or mistake, whether of fact or law, in expressing that intention in the instrument used.   . . .   But where parties contract for a particular result, and intend to effect it, and fail to accomplish it, even through ignorance or mistake of law, equity will effectuate the intent of the parties."

In *Canning Co.* v. *Ott*, 88 Miss. 771, 41 So. 378, the court cited with approval 2 Pomeroy on Equity Jurisprudence, section 845, as follows:

"If an agreement is what it was intended to be, equity would not interfere with it because the parties had mistaken its legal import and effect.   If, on the other hand, after making an agreement, in the process of reducing it to a written form, the instrument, by means of a mistake of law, fails to express the contract which the parties actually entered into, equity will interfere with the appropriate relief, either by way of defense to its enforcement, or by cancellation, or by reformation, to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact.   In this instance there is no mistake as to the legal import of the contract actually made, but the mistake of law prevents the real contract from being embodied in the written instrument.   In short, if a written instrument fails to express the intention which the parties had in making the contract which it

purports to contain, equity will grant its relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing."

In *Miles* v. *Miles*, 84 Miss. 624, 37 So. 112, the court said among other things:

"To hold that a court of equity could not interpose to correct mistakes for the reason alone that the parties used the terms they actually intended to use would be to curtail its powers to a hitherto unheard of extent. Most mistakes of fact in conveyancing, except those caused by clerical misprision, arise in cases when descriptive terms are intentionally employed under the mistaken impression that they apply to the property sought to be conveyed."

And Justice SHARKEY, in *Simmons* v. *North*, 3 Smedes & M. 67, said:

"When a mistake is admitted, then it is said there is no difficulty; then there is an equity dehors the deed or instrument, and the power to relieve is said to be quite as clear when the mistake is shown by proof either written or parol."

In 9 C. J. section 22, p. 1169, the author, in discussing the question of the cancellation of instruments on the ground of mutual mistake of law by the parties thereto used this language:

"It has been held very generally that the rule is confined to mistake of the general rules of law, and that it has no application to the mistakes of persons as to their own private legal rights and interests. So it has been held that an honest mistake of law as to the effect of an instrument on the part of both contracting parties, when such mistake operates as a gross injustice to one and gives an unconscionable advantage to the other, may be relieved in equity."

If the lessee was at the time of the making of said deed to the merchantable timber on said land entitled to invoke against the county the grantor therein, any one or more of the equitable principles above referred to, then it

seems to me to be idle to ask the question whether there was any valid binding consideration for said deed—if it needed any other consideration than the two 'thousand eight hundred and sixty dollars paid for right to the timber which did not pass under the lease.

Take this hypothetical case, which is substantially the case before the court, except the parties are individuals: A. owns a half section of timber land which has no sale value except for the merchantable timber thereon.  B., a timber dealer, approaches A. to buy the timber on said land.  They agree on a price of, say two thousand dollars, to be paid in 15 annual installments, with a 15-year period, in which to cut and remove the timber.  Conceiving a lease for a term of 15 years will effectuate their purpose, the parties accordingly adopt that form of contract, which is duly executed.  Later, when the lease notes begin to fall due, and before the timber is cut and removed by the lessee, B., the latter learns there is some doubt under the law as to whether his lease carries with it a right to·the merchantable timber on the land leased and so informs A., the lessor; thereupon A. says, "Well, that is what both of us thought you were getting in the negotiations leading up to the lease; that is what you thought you were buying, and that is what I intended to sell you—the right to cut and remove the merchantable timber.  Therefore we will just put at rest all trouble about that matter, and I will now execute you a deed conveying you the merchantable timber on said land, in consideration of said notes already executed in the form of lease notes, with the right to remove said timber within 15 years from the date of said lease."  Accordingly this is done:  The deed is executed and delivered by A. to B., and the latter on the faith thereof proceeds to cut and remove the merchantable timber from said lands.  And after he has done so A. goes into a court of equity claiming that his said deed is void, and seeks to repudiate it, and to recover the actual value of the timber so cut and removed by B., and at the same time retain the purchase price thereof, two thousand dollars,

paid him by B.   What sort of standing would A. have in a court of equity in a case of that kind?   It looks to me like he would not get very far in a court of conscience. To succeed he would have to overturn some of the fundamental principles of equity jurisprudence, as it appears to me.

The majority opinion seems to lay stress on the fact (asserted in the opinion to be a fact) that when Moores received a conveyance from the county to the timber he still held onto his lease.   It is true that there was no formal surrender and cancellation of the lease, nor any express agreement to that effect.   But the whole transaction could mean nothing else.   The deed was made in consideration of the fact that the lease was worthless. Having accepted the deed on that theory, it seems clear that thereafter Moores' rights were measured by the deed, and not the lease.   There was no necessity for a formal surrender and cancellation of the lease in view of the fact that neither party treated it as of any value; and, furthermore, they expressly agreed that it did not embody the contract intended.

I am authorized to say that SYKES, J., joins me in this dissent.