SCHOENFIELD v. VEENBOER.

1. Reformation of Instruments—Deeds—Description—Mutual Mistake.

In a suit to reform a deed, where by the mistake of the scrivener in writing the contract a mistake was made in the description and such description was copied therefrom into the deed, but all the parties were familiar with the premises whose boundaries were marked by fences, and all knew and understood what property was intended to be conveyed, and defendants later gave a mortgage on the property which contained the correct description, plaintiff was entitled to a decree correcting the description in the deed on the ground of mutual mistake.[1]

2. Equity—Power of Court to Correct Mutual Mistake in Deed.

A court of equity having jurisdiction of the parties and the subject-matter is authorized to correct a mutual mistake in a deed so as to give effect to the intention of the parties.[2]

Appeal from Kent; Dunham (Major L.), J. Submitted January 21, 1926. (Docket No. 17.) Decided March 20, 1926.

Bill by David Schoenfield against William Veenboer and another to reform a deed. From a decree for defendants, plaintiff appeals. Reversed, and decree entered for plaintiff.

*G. A. Wolf* and *Clare J. Hall,* for plaintiff.

*Elvin Swarthout,* for defendants.

Sharpe, J. The bill of complaint was filed by plaintiff to reform a warranty deed and correct a mistake therein as to the description of the land conveyed.

[1]Reformation of Instruments, 34 Cyc. p. 988; [2]Id., 34 Cyc. p. 917.

Plaintiff obtained title to the property June 21, 1888, by warranty deed from Charles L. Davis and wife. The description in this deed was as follows:

"All that certain piece or parcel of land situate and being in the township of Grand Rapids, county of Kent, and State of Michigan, and described as follows: towit, all that certain piece or parcel of land in section thirty-four (34) town seven (7) north of range eleven (11) west lying and being in the county of Kent, in the State of Michigan, which is bounded and described as follows: Commencing on the west line of section thirty-four (34) 29.24 chains north from the southwest corner of said section to the center of the Clinton road, so-called; running thence south 57 degrees east along the center of said road, 30.54 chains to the place of beginning; thence north 25 degrees 30 minutes east 15.35 chains to the margin of the lake; thence south 70 degrees east along the margin of lake, 2 chains; thence south 23 degrees and 30 minutes west 15.95 chains to the center of Clinton road; thence north 57 degrees west, 2.50 chains to the place of beginning, containing 3 and 42/100 acres of land."

Plaintiff first gave defendants a contract of purchase, and in this contract the property was described as follows:

"All that certain piece or parcel of land situate in the township of East Grand Rapids, in the county of Kent, and State of Michigan, described as follows, viz.: Part of the southwest fractional quarter of section numbered thirty-four (34) in township numbered seven (7) north of range numbered eleven (11) west bounded as follows: Commencing in the center of Lake drive two thousand fifteen and 64/100 (2,015.64) feet southeasterly from intersection of center of Lake drive with the west line of section thirty-four (34), thence easterly in center of Lake drive one hundred and sixty-five (165) feet, thence north 25½ degrees east to Reeds lake, thence west along said lake one hundred and sixty-five (165) feet, thence southerly to the place of beginning."

This contract was dated November 29, 1920, and the

deed in question was given December 15, 1921.    In the deed the exact description contained in the contract was inserted, thereby making the same mistake.    The difference in description in the deed given to plaintiff and the one given by him to the defendants is in the width of the land running along the lake.    The parcel of  land  which  plaintiff  owned  contained  3.42  acres and had a frontage on the lake of only 132 feet, while his deed to defendants described it as being 165 feet.

As this case must be reversed, the testimony taken upon the trial will be referred to and quoted at some length.    Herman VanAalderen testified that he had been in the abstract business for 50 years, and was acquainted with all of the parties to the transaction. That  plaintiff  and  Mrs.  Veenboer,  at  the  time  the contract was made, came to his office together, but not by any previous arrangement.    At her request he examined the abstract for Mrs. Veenboer and told her the title was all right and then he prepared the contract, but no one told him what description to put in.

"*Q.* Now, from where did you get the description? "*A.* I don't know.    I made a mistake there; I admit that.

"*Q.* Now will you just tell what mistake you made? "*A.* I made a mistake in the course along the lake. The description should be 2 chains and 50 links along Lake drive and 2 chains along the lake shore, and I figured 165 feet having the north side and the south side alike.    By making it in feet instead of chains and links, I made the mistake; that is all, because Mr. Schoenfield didn't get only 2 chains and 50 links on Lake drive where he gets two chains along the lake shore.    Later on I drew the deed from the contract and consequently made the same mistake over.    This is the deed that I prepared later.    (Paper received in evidence  and  marked  plaintiff's  Exhibit  4.)    The original mistake was made in the contract, and the deed followed the same mistake over and over again, instead of figuring out, because I didn't look at the

abstract any more.    I first learned that this mistake had been made when Mr. Veenboer called my attention to that last fall, or last summer."

On cross-examination this witness testified in part:

"*Q.* (Showing witness paper) :   Now, how did you get the description as given here in this land contract, Mr. VanAalderen?

"*A.* Well, the last word is here on the 165 feet, I made a mistake on the figure.

"*Q.* I ask you how you got the description?

"*A.* How I got the description?    I figured on the feet along the shore instead of saying 2 chains.    I figured on the same way probably on Lake drive, the 2 chains and 50 links, and made it 165 feet in all.

"*Q.* Well, what did you translate into those terms there, from what did you translate?

"*A.* Well, from memory probably or from going along the courses.

"*Q.* Not from a reference to the abstract?

"*A.* No, I made the mistake there; that is all.    This document was not signed in my office.    I gave it to Schoenfield or somebody and they took it away and signed it.    I next saw these people when they got their deed.    They did not interview me at any time in regard to this matter between the making of the contract and the making of the deed.    I made up the deed on the same date as the acknowledgment, and copied the description right out of the contract, word for word. I did not have these land contracts in the meantime. I don't know whether Schoenfield brought in his copy of the contract to make the deed or not.    I presume he did, because otherwise I would have made it from the records and would have found the mistake.    My recollection is that Mr. Schoenfield brought in the contract and I made the deed from that.    Dr. and Mrs. Veenboer were not present at the time I made this deed and took Mr. Schoenfield's acknowledgment."

The plaintiff testified on direct-examination that at the time he negotiated the sale of the property to Dr. Veenboer and his wife the following occurred:

"I first heard about the Veenboers with reference to buying my place from my daughter-in-law who

wrote me at Cheboygan.   After she had written me I wrote them that I would come down and meet him. That is the first time I met Dr. Veenboer and his wife. They came to my house.   I was there when they came in.   My daughter-in-law introduced me.   We sat down.   I remember the doctor was seated to my right and the Mrs. to my left, and my daughter-in-law right across from me, and for two or three minutes they were in the doctor asked me, 'What is your frontage on the lake, Mr. Schoenfield, and on the street?' I told him on the street, it used to be called Clinton road, when I got it they called it, now Lake drive, I have got 10 rods on Lake drive, 165 feet.   It runs narrower towards the lake; I have 8 rods of lake front, 132 feet.

"*Mr. Swarthout:* I object to that, your honor, for the same reasons I have given.   It tends to vary and modify the terms of this man's contract and deed, and is incompetent.

"*The Court:* Well, the objection is overruled.   The answer will stand.

"(Witness continuing) : Then the doctor said, 'Well, you haven't got quite as much front on the lake as you have got on the street?'   I said, 'No, sir.'

"*The Court:* All this conversation may be taken subject to Mr. Swarthout's objection.

"(Witness continuing) :   The fences are up on both sides, on the east side and on the west side, and there is not a penny against the property nor one cent of incumbrance, and I have the taxes all paid up and the receipts saved.   Then the lady spoke up, Mrs. Veenboer, and says, 'I understand you want ten thousand?' 'Yes.' 'We haven't got all the cash, but we will pay you half of it in a month and the balance in a year.' I says, 'that will be all satisfactory, but in order to make a bargain, why you better make a small payment down, because that is business.'   He says, 'That is all right' and he gave me a check for $100.   The lady spoke and says, 'Where will we go to have the papers made out?'   'Any competent man, it doesn't make any difference to me.'   I says, 'Herman VanAalderen is a very competent man, and he has an abstract office and Hunt and Davis have an abstract office.'   And the Mrs. said, 'We know him, that is all right.'   And they said, 'We will be down town tomorrow morning

any time you say, about half-past 9 or 10 o'clock.'
So we met at the abstract office and seen Herman.    At
the house in this conversation the total amount of land
was mentioned.    I explained to him how much I had
on Lake drive and on the lake, and I said, 'not quite
three acres and a half; it is a very long strip.' "

On cross-examination plaintiff testified on this
subject:

"I don't believe they were in there two or three
minutes when the doctor asked me the question, 'How
much lake front have you got and how much on the
street?'    I says 'On the street they called that Clinton
road, now they call it Lake drive.    I have got 10
rods, 165 feet on Lake drive.    It runs narrower
towards the lake; I have 8 rods lake front, 132 feet.'    I
told Dr. Veenboer that while we were there in the
house that day.    He or his wife said they were going
to build a home on it for themselves.    I didn't know
whether they intended to tear down the house in
which my daughter-in-law lived.    I think they said
they intended to build toward the lake front.

"Q. Did they say so?

"A. They said lake front.    They did not go over
the place with me.    I don't know of their having
gone over any part of it.    They didn't go over it while
I was there and I didn't go over it with them.    They
did not make any measurements while they were
there.    I didn't make any measurements while they
were there.    The interview I had with them was
not very long.    It might have been at the utmost half
an hour.    I don't hardly think it was that long.    The
price was stated by me at $10,000.    There was no
haggling over the price.    The lady spoke that we
cannot pay it all, but we will pay you half down in
a month and the other half in a year, and then I said,
'Well, it is business to make a small payment down,
if you can,' and they said 'Yes, we will give you a
check for a hundred dollars.'    And they did so, and
the Mrs. said then, 'Where will we go to make out
papers?' and I said 'any competent man.    I know
Herman VanAalderen for a good many years, he done
nothing else.    I knew him in the abstract office; I guess
he knew how to make out papers of that kind.'    And

they said, 'We know the gentleman, too, he is all right, satisfactory to us.' Then we said, when will we meet? Tomorrow morning, because I want to go back north. Tomorrow morning we will meet at the office at half past 9 or 10 o'clock. I said 'all right, I will be down,' and we did. We were not very long in Mr. VanAalderen's office, while he made out the contract. About a half hour, maybe. * * *

"When I found out there was some trouble about the description I wrote you a letter. I was rather astonished; I didn't know what to say. I wanted everything what was right and I said, 'if there is a mistake in making out the papers why, Herman VanAalderen must have made a mistake.' Then I said I was coming down. I went and saw Herman VanAalderen. He didn't know how he made the mistake first. Of course we are liable to make mistakes. He didn't tell me how he had learned there had been a mistake. He didn't tell me about Dr. Veenboer coming to him.

"The doctor inquired about the lake frontage when he came to see me at my house. He wanted to know about it. He seemed to be interested in the lake frontage. I don't know that the lake frontage is the most valuable part. Some like the lake front and others don't care for the lake front. I suppose the lake frontage in that neighborhood is considered to be quite valuable. I have not inquired what they are selling now. There have been a lot of fine houses built up there in that neighborhood in the last 10 or 15 years farther up, in the woods rather than the lake front. * * *

"My house was on the south end of the lot toward Clinton road, so that the rear of the lot was all open and unimproved and a fine site for a house overlooking the lake. The bluff overlooking the lake from my lot is maybe 65 or 70 feet high. From the foot of the hill to the level of the water in the lake may possibly be 30 or 35 feet. It used to be rather swampy right down on the edge of the lake, but not now. It used to be when I first bought the property, but the lake is going down. These fences went clear to the water of the lake. I guess they were way out to the water of the lake unless somebody took them down. At the time I sold this property the fences

went clear to the water of the lake.    I kept two cows. I had to build farther out to keep them in.

"*Q.* At the time you had this interview with Doctor and Mrs. Veenboer, did you know that you did not have 165 feet of land on the lake?

"*A.* I knew I never had it.

"*Q.* You knew you never had it, and you knew you had 165 feet on the Clinton road?

"*A.* On Clinton road, yes, sir, 10 rods in front on Lake drive, and 132.    I got tax receipts to show that."

Mrs. Mabel Schoenfield, daughter-in-law of the plaintiff, corroborated him in much of his testimony.    On direct-examination she says that Dr. Veenboer asked plaintiff how much land he had, and plaintiff replied not quite three acres and a half; he said "I have 10 rods.    I have 165 feet on Clinton road now called Lake drive, and I have 132 feet or 8 rods on the lake front."    Dr. Veenboer spoke up and says, "Mr. Schoenfield, you have not as much land on the lake as you have on the road" and my father-in-law spoke and said "No, I have not."    She also stated that she did not remember of anything being said about the fences, and that she did not see the defendants look over the property.

Prior to 1914 defendants had purchased on land contract from Mr. Bonnell a little over an acre of land which adjoined that of plaintiff on the east.    It did not run to either Lake drive or to the lake, but fronted on Reed's Lake boulevard.    They built a garage on the property and lived in it for about two years, intending to build a house there.    While living on this property the defendants became more or less familiar with the plaintiff's property.    Mrs. Veenboer, one of the defendants, testified that she found out that plaintiff's property was for sale about a year after they had moved from their land adjoining; that they were more or less familiar with the premises because of having lived there.    Examined by her counsel, she testified:

"*Q.* Well, now, I wish you would tell us just what conversation was had between the four of you in regard to the size of that lot.

"*A.* We were told that the size of the lot was a little over three acres and that there were 165 feet on Clinton road running back to the lake.

"*Q.* Was there anything more said by the Schoenfields or either of them in regard to the description of the property?

"*A.* I have absolutely no recollection of anything further being said as to measurements."

On cross-examination she testified further, as follows:

"I am the doctor's private secretary. I have his power of attorney. He has left absolutely all of his business to me.

"*Q.* Now, you have been with him at times between 1916-1918 that he has gone over the property and looked over the Schoenfield property?

"*A.* I have.

"*Q.* Both from the site of the Schoenfield house looking through it east and west and looking at it from the lake?

"*A.* I don't think I was with him on the lake because I don't swim, and I don't know as I stayed at the house, but from our side of the fence we often stood there and admired it.

"*Q.* Hoped some day to be able to buy it?

"*A.* We did.

"*Q.* And the fences ran down to the lake as he described?

"*A.* It did.

"*Q.* And that is the property you bought, the property between the fences just as he said?

"*A.* It was."

Dr. Veenboer, the other defendant, testified on direct-examination as to his talk with plaintiff when arrangements were made to purchase the property as follows:

"*Q.* Now will you tell us what transpired at this interview?

"*A.* At this interview we asked Mr. Schoenfield—I did—as to the property. He told me he had 165 feet on the lake front and that it ran back to the lake.

"*Q.* Lake drive you mean?

"*A.* Yes, on Lake drive, or Clinton road, and it ran back to the lake, and that there was something over three acres of property, but no definite amount, exact amount, was stated, and that he wanted $10,000 cash, which we felt we were unable to raise at the time. Well, we said we were unable to raise that at that time and asked to have a little easier terms on the property, and this was accepted, we to pay $5,000 on delivery of the contract and $5,000 at the end of a year, with the interest on the $5,000.

"*Q.* Was there anything more said by Mr. Schoenfield, as you recall, in regard to the measurements of the property?

"*A.* He said nothing more to me in regard to measurements of the property.

"*Q.* Do you recall his having told you in that interview that he had only 132 feet on the lake?

"*A.* I have no recollection whatever."

And again he testified in response to a question by his counsel:

"*Q.* Was there anything in the looks of the fences that indicated to your eye that this was not a parallelogram? * * *

"*A.* It had the appearance of being a parallelogram.

"*Q.* And did you buy with the understanding and belief that it was a parallelogram? * * *

"*A.* I thought it was a parallelogram and bought it that way."

On cross-examination the doctor testified:

"I first started living on the property on the east side of the Schoenfield property in the fall of 1916 and lived there until the fall of 1918, winter and summer. Between 1918 and 1920 I lived at No. 1, Auburn avenue, all the time. From 1916 to 1918 I was on the Schoenfield property a few times; I can't exactly remember, three or four. The building I was living in was about 500 feet north of Lake drive. I had a little over an acre. The west line of our property

was bounded by the fence on the east line of the Schoenfield property.    In this four or five times I had gone from the east line of the Schoenfield property to his house; that is all.    Perhaps once I was on their property opposite our house, a little to the north of it, but never went across the property at any time prior to the time I bought it.

"*Q.* Did you ever go the length of the property from Lake drive to the lake?

"*A.* Well, certainly on the other side of the fence.

"*Q.* On which other side?

"*A.* The east side of the fence from their property.

"*Q.* No, now I am talking about the Schoenfield to Reeds lake through the Schoenfield property?

"*A.* Not before we bought it.    I conceived the idea that I would like to buy the Schoenfield property while I was still living on the old property, and that was prior to the end of 1918.    Starting at the hill and going down the hill there is a kind of a plateau leading out to the lake, and there are a lot of trees and bushes and things of that nature and comparatively in their wild state, and they are in their wild state yet, and that was one of the things that caused me to have a desire to purchase their particular piece of land.    The growth down there is fairly dense.

"*Q.* Now, you have never been on the Schoenfield property below the hill prior to the time you bought it?

"*A.* Not on the property.    I had investigated from a boat drawn near the shore, and that is as near as I had been; I hadn't been on to the property.

"*Q.* Well, just where did you stand when you looked at these fences and determined that the property was a perfect parallelogram?

"*A.* Well, I stood by their house.

"*Q.* By their house?

"*A.* Yes, sir.

"*Q.* And that would be, according to Mr. Swarthout's question of Mrs. Schoenfield, on the south of the property?

"*A.* Yes, sir.

"*Q.* You couldn't possibly see the fence over the hill?

"*A.* No, sir.

"*Q.* On either side?

"*A.* No, sir.

"*Q.* And so you didn't make any investigation and could not determine then that it was a perfect parallelogram over beyond the hill, could you?

"*A.* No.

"*Q.* Well then, your testimony where you said on direct-examination that this property was a perfect parallelogram, applies only to the situation at the Schoenfield house and you don't intend to apply it to the property below the hill?

"*A.* Only so far as one would judge that the fences would continue in the same direction.

"*Q.* No, no, that is not an answer to the question and I ask that it be stricken out.

"*The Court:* It may be stricken out as not responsive.

"*A.* One could see from the lake.

"*Q.* No, just a minute; I am not talking about the lake at all.

"*The Court:* Mr. Reporter, will you read that question (question read).

"*A.* I do intend to apply it to the property below the hill.

"*Q.* All right, now, when did you make the examination of the fences below the hill prior to the time you purchased the property in 1920?

"*A.* I have often been down the hillside on the east side of the fence, and it was a straight line and I could see from the lake that the fence on the west side was a straight line up over the hill.

"*Q.* Well, now, you couldn't see over the east side of the fence on the east side of the Schoenfield land through that growth, that underbrush, the fence on the west line, could you?

"*A.* Could from the lake though.

"*Q.* Now, doctor, answer my question.    I move that this answer be stricken out.

"*Mr. Swarthout:* It has been answered before.

"*The Court:* That may be responsive if the doctor means when he is on the lake.

"*Q.* No, but I asked from the east side from the fence on the east line of the Schoenfield property, if you could see through to the fence on the west side?

"*A.* Yes, you can.

"*The Court:* He says he could.

"*A.* From my position on the lake.

"*The Court:* Well, I see how you distinguish.     I think, doctor, if you will just listen to the question and understand the question.

"(Question read.)

"*A.* I could see the fence on the west and by my eyes at least.

"*Q.* Well, now fix the place where you could see through that underbrush and growth standing on the land on the east side of the fence, on the Schoenfield property?

"*A.* You can stand on the brow of the hill and see right straight across.

"*Q.* I am talking about below the hill.

"*A.* All right, you go down to the bottom of the hill, and on the plateau you can see the fence again.

"*Q.* Well, how much of the fence, how far from the foot of the hill north?

"*A.* Oh, about 20 feet.

"*Q.* Now, how many times did you look at that before you purchased in 1920?

"*A.* I don't know how many times I have been down there; several times.

"*Q.* Well, was it in 1918?

"*A.* In 1916 and 1918.

"*Q.* Now, how many times did you look at it from the lake?

"*A.* I think we used to go in bathing and we went in several times and we had a boat and I have seen it several times; I couldn't say how many times.

"*Q.* Well, of course looking at it directly south, you couldn't tell whether it was a parallelogram or not, could you?

"*A.* No.

"*Q.* But you knew from 1916 on that there were fences on each side of this property all'the way down to the lake, didn't you—what was the answer?

"*A.* Excuse me—I am asserting nearly to the lake; yes, sir.

"*Q.* Well, the fences were in the water, the posts farthest north were in the water, weren't they?

"*A.* Well, not at the present time; not at that time.

"*Q.* No, in 1916?

"*A.* Well, they were close enough to the water; I will admit the question.

"*Q.* And these reeds growing up around the posts are farthest north, aren't they?

"*A.* Yes.

"*Q.* Have you always referred to that property between those fences as the Schoenfield property?

"*A.* Certainly.

"*Q.* Do you know what the distance was from Lake drive to the lake in 1916 and 1918?

"*A.* I did not then.

"*Q.* Well, then, you were familiar then, doctor, with this property from where it started on Lake drive all the way through to the lake as early as 1918, weren't you?

"*A.* Yes, sir, to a certain degree.

"*Q.* Well, you were familiar with it all on the high land?

"*A.* I had never been across the property. I had looked across the property.

"*Q.* Well, up on the highland you could look across the property?

"*A.* Yes, sir.

"*Q.* And then you had looked at it both on the low land, both on the plateau and closer to the lake?

"*A.* Yes, sir.

"*Q.* And that is the property you and Mr. Veenboer decided to buy?

"*A.* Yes, sir.

"*Q.* And first you went to Mrs. Schoenfield and made inquiry and got the price, didn't you?

"*A.* Yes, sir.

"*Q.* And you really didn't want to buy all of it, but you made inquiry if you couldn't buy the lake frontage and not buy the rest?

"*A.* Yes, sir.

"*Q.* And you also asked her to determine from Mr. Schoenfield what price he wanted?

"*A.* Yes, sir, Mrs. Veenboer did.

"*Q.* And the answer came back that he would sell the entire place, piece of land for $10,000?

"*A.* Yes, sir.

"*Q.* And that is what you agreed to buy?

"*A.* Yes, sir.

"*Q.* What you intended to buy when you fixed this deal up with him on the 27th of November, 1920?

"*A.* Yes, sir.

"*Q.* That property that you had always considered the Schoenfield property?

"*A.* Yes, sir."

The doctor also testified very positively that he read the descriptions in the contract and deed and noted that they gave the width along the lake as 165 feet. It appears, however, that, in order to raise a portion of the purchase price, the doctor was compelled to give a mortgage on the property to the bank. In this mortgage two descriptions appear, the one in plaintiff's deed from Davis (the correct description) and the one in defendants' deed from plaintiff. Had the doctor read this mortgage and paid as much attention to it as he claims he did to the conveyances from plaintiff he would have ascertained that there was a discrepancy in the descriptions. On being questioned on this subject he testified:

"*Q.* Now you read the mortgage carefully, didn't you?

"*A.* Yes, sir.

"*Q.* Read the entire instrument?

"*A.* Now, I don't believe I read the mortgage thoroughly. I read the deed, but I don't remember I read the mortgage thoroughly at that time until after this came up."

The trial court found for the defendants, and the decree provides:

"The court finds that the mistake in the description in said deed was due to the default of the plaintiff and that the defendants supposed they were purchasing (under and by said deed of December 15, 1921) 165 feet of frontage on Reeds lake, and that plaintiff at that time did not have and own more than 132 feet of frontage on Reeds lake, and that he cannot acquire the necessary 32 feet at the present time to make his deed good."

The decree also provides that the strip of land the defendants are now deprived of is of the value of

234—Mich.—11.

$2,000, and decrees that plaintiff shall pay them that sum with interest at the rate of 6% per annum from the date of the contract to the date of the decree. From this decree the plaintiff appeals, and now claims that it is against the overwhelming weight of the evidence, and that the undisputed evidence shows that the defendants received the identical parcel of land they purchased, but, by mistake of the scrivener, one of the boundary lines was improperly described.

There can be no doubt, from the undisputed testimony above quoted, that plaintiff owned no more land than that inclosed by the fences, and that he intended to convey to defendants no greater amount. The abstract correctly described the land, and plaintiff turned it over to Mr. VanAalderen, who drafted the contract, and if he had used it to get the description no trouble would ever have arisen. There is no question but that Mr. VanAalderen made a mistake in the contract description. He positively asserts it, and no one disputes it. Was the mistake in description mutual between the seller and the buyers? We think it was. Mrs. Veenboer was present when the contract was made, and had Mr. VanAalderen examine the abstract for her to see if the title was in the plaintiff. He advised her it was, but had he examined to see in whom the title was to the land he conveyed, he must have advised her otherwise.

Everything throughout the entire transaction between the parties points irresistibly to the conclusion that there was a mutual mistake. The defendants had been very familiar with this property for years. They had looked it over from every angle. They must have known that the fences marked the boundary lines, and if, when they came to buy it, they were as particular about the dimensions as they now are, they unquestionably asked plaintiff the number of feet along the road and the number of feet along the lake,

just as plaintiff testified they did, and if they asked him, he must have replied in substance as he claims that the land was 10 rods along the road, and only 8 rods along the lake, because that was what the abstract of the land clearly showed.

We are convinced, too, that if Dr. Veenboer examined his contract and deed carefully as he says he did, that he also examined the mortgage he gave on the place, which contained the correct description, and knew then what his deed contained.

Plaintiff cites *Conlin* v. *Masecar,* 80 Mich. 139, which is very similar in its facts to the instant case, and is authority that equity may give relief where by mistake the intent of the parties has not been expressed.

"The right of a court of equity to correct a written conveyance so as to carry out the intention of the grantor, where a mistake has been made by the scrivener, is well established." *Newland* v. *Baptist Church Society,* 137 Mich. 337, and authorities there cited.

"The mistake must be mutual. For relief by reformation in equity, it is essential that the error be made by both parties, and that it be admitted by defendant or distinctly proven." *Miles* v. *Shreve,* 179 Mich. 679, and authorities cited.

The facts here clearly establish a mutual mistake, a condition which brings the case within the rule of law giving courts of equity power to correct a written instrument. Defendants first complained when their landscape gardener advised them that there was a less number of feet along the lake than their deed called for. They were perhaps disappointed, but they both admit that they understood and knew all along that they were buying the land inclosed by the fences and nothing more.

The decree should have granted the relief prayed by plaintiff as to reformation of the deed, without

awarding any damage to the defendants. Such a decree may be entered.

Case reversed, with costs of both courts to plaintiff.

BIRD, C. J., and STEERE, FELLOWS, WIEST, and CLARK, JJ., concurred. SNOW and McDONALD, JJ., did not sit.